# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT
### No. 24-1026

DANIEL CHRISTENSEN and
PAULA CHRISTENSEN
as next of kin to Donna Christensen
and as special administrator to her estate,

      Plaintiffs - Appellants,

v.

WILLIAM WEISS, et. al.

      Defendants - Appellees.

On Appeal from the United
States District Court for the
Western District of Wisconsin,
Case No. 3:22-cv-00253

Judge James D. Peterson

---

## BRIEF AND REQUIRED SHORT APPENDIX OF PLAINTIFFS-APPELLANTS DANIEL CHRISTENSEN AND PAULA CHRISTENSEN, AS NEXT OF KIN TO DONNA CHRISTENSEN AND AS SPECIAL ADMINISTRATOR TO HER ESTATE

---

MCCOY LEAVITT LASKEY LLC
Michael D. Aiken
N19 W24200 Riverwood Drive, Ste. 125
Waukesha, WI 53188
Phone: (262) 522-7000
Fax: (262) 522-7020
maiken@mlllaw.com

HAVAS & JOY, SC
Jeffrey A. Joy
7949 N. Port Washington Road
Glendale, WI 53217-3136
Phone: (414) 271-7300
Fax: (414) 271-7301
jjoy@havasandjoy.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: No. 24-1026

Short Caption: Christensen, et. al. v. William Weiss, et. al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐          **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Daniel Christensen, Paula Christensen, as next of kin to Donna Christensen and as special administrator of her estate 


(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 McCoy Leavitt Laskey, LLC

 Havas & Joy, S.C.

(3)      If the party, amicus or intervenor is a corporation:

    i)        Identify all its parent corporations, if any; and

         N/A

    ii)       list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         N/A

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

Attorney's Signature: s/ Michael Aiken          Date: 3/18/24

Attorney's Printed Name:  Michael Aiken

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑   No ☐

Address: N19 W24200 Riverwood Drive, Suite 125

 Waukesha, Wisconsin 53188

Phone Number: (262)522-7018          Fax Number: (262)522-7020

E-Mail Address: maiken@MLLlaw.com

Save As

Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: No. 24-1026

Short Caption: Christensen, et. al. v. William Weiss, et. al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐        **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)        The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
           Daniel Christensen, Paula Christensen, as next of kin to Donna Christensen and as special administrator of her estate

(2)        The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
           McCoy Leavitt Laskey, LLC

           Havas & Joy, S.C.

(3)        If the party, amicus or intervenor is a corporation:

    i)         Identify all its parent corporations, if any; and

               N/A

    ii)        list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

               N/A

(4)        Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

           N/A

(5)        Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

           N/A

Attorney's Signature: s/ Jeffery Joy                              Date: 3/20/24

Attorney's Printed Name:  Jeffery Joy

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑    No ☐

Address:  7949 North Port Washinton Road

           Glendale, Wisconsin 53217

Phone Number: (414)271-7300                          Fax Number:  (414) 271-7301

E-Mail Address: jjoy@havasandjoy.com

rev. 12/19 AK

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE ............................................................... proceeding page i

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT REGARDING ORAL ARGUMENT .................................... v

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF ISSUES ON APPEAL ..................................................... 2

STATEMENT OF THE CASE ....................................................................... 3

    A. The District Court Grants a Joint Motion to Extend the Dispositive Motion Deadline and then "STRUCK" the Scheduling Order. .............................................................. 9

    B. Plaintiffs File a Motion to Extend Time for Filing an Affidavit of their Expert, Dr. Amber Carda, Two Days After the Summary Judgment Deadline. ............................................... 11

    C. Plaintiffs File a Motion to Amend to their Complaint to Add Caldwell and Malone to the Suit. ......................................................................................................................... 13

SUMMARY OF ARGUMENT .................................................................... 14

ARGUMENT ................................................................................................ 18

    I.    THE COURT UNREASONABLY REFUSED TO ALLOW PLAINTIFFS' ADDITIONAL DISCOVERY TO OPPOSE SUMMARY JUDGMENT. ................... 18

    II.   THE COURT UNREASONABLY REFUSED ALTER THE SUMMARY JUDGMENT RESPONSE DEADLINE TO PERMIT THE CARDA DECLARATION INTO THE RECORD BASED ON A SHOWING OF EXCUSABLE NEGLECT. .... 20

    III.  THE COURT UNREASONABLY DENIED PLAINTIFFS' MOTION FOR LEAVE TO     AMEND TO JOIN ADDITIONAL PARTIES. ................................................. 22

    IV.  THE DISTRICT COURT ERRED BY GRANTING SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS FOR CONSTITUTIONAL VIOLATION PURSUANT §1983. ....................................................................................................... 24

        A. There is Sufficient Evidence to Support a Finding that Wilmot Used Unreasonable Force on Christensen. ................................................................................. 24

        B. ACH/Vilas County Denied Christensen Medical Treatment for Obvious Symptoms of Mental Illness, or Alternatively, Supplied Grossly Inadequate Treatment. ........ 28

           a. A Reasonable Jury Could Find that Ziemba's "Support and Encouragement" Instead of Medical Care Was Deliberately Indifferent to Christensen's Symptoms of Mental Illness. ............................................................. 29

           b. A Reasonable Jury Could Find that Ziemba's Care Was So Woefully Inadequate it Amounted to No Medical Care. ................................................. 31

           c. A Reasonable Jury Could Find Supervisory Liability on the Part of Vilas County's Wilmot and ACH's Melissa Caldwell. ............................................. 35

           d. A Reasonable Jury Could Find Monell Liability on the Part of Vilas County/ACH for Its Unconstitutional Policy of Medical Care for Mental Illness. ............................................................................................................ 35

C. Wilmot's Unreasonable Use of Force Resulting in Christensen's Prolonged Solitary Confinement and ACH/Vilas County's Lack of Medical Treatment Were Each a Cause of Christensen's Mental Anguish and Suicide................................................ 37

D. A Reasonable Jury Could Find Defendants Were Deliberately Indifferent to a Substantial Risk of Harm to Christensen, Including Suicide................................... 40

   a. A Reasonable Jury Could Find Defendants Were Aware of a Substantial Risk of Harm of Placing Christensen in Prolonged Solitary Confinement Under the Circumstances. ................................................................................................ 40

   b. A Reasonable Jury Could Find Defendants Deliberately Indifferent to Christensen's Prolonged Solitary Confinement Without Medical Treatment or Other Precautions Against Self Harm. ............................................................ 43

CONCLUSION.................................................................................................... 45
CERTIFICATE OF COMPLIANCE WITH CIR. R. 30(a)&(b)................................. 45
CERTIFICATE OF COMPLIANCE WITH TYPE REQUIREMENTS...................... 46
CERTIFICATE OF SERVICE ............................................................................ 47
TABLE OF CONTENTS – REQUIRED APPENDIX............................................. 48

# TABLE OF AUTHORITIES

## Cases

*Bass by Lewis v. Wallenstein*, 769 F.2d 1173 (7th Cir. 1985) ...................................................... 43
*Belcher v. Lopinto*, 492 F.Supp.3d 636 (E.D. Louisiana 2020) ............................................... 36, 42
*Cavalieri v. Shepard*, 321 F.3d 616 (7th Cir. 2003) .......................................................................... 44
*Chilcutt v. Santiago,* 2023 WL 4678583, *6 (7th Cir. 2023) ....................................................... 25
*Estate of Cills v. Kaftan*, 105 F.Supp.2d 391 (D. New Jersey, 2000) ......................................... 44
*Estate of Cole by Pardue v. Fromm*, 94 F.3d 254 (7th Cir. 1996) .............................................. 41
*Estate of Shafer v. Commissioner,* 749 F.2d 1216 (6th Cir.1984) ............................................. 28
*Estelle v. Gamble*, 429 U.S. 97 (1976) ........................................................................................... 28
*Farmer v. Brennan,* 511 U.S. 825 (1994) ....................................................................................... 40
*Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, (7th Cir. 2017) .................................................... 36
*Gracyalny v. Westinghouse Elec. Corp.*, 723 F.2d 1311 (7th Cir. 1983) .................................. 38
*Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990) ........................................................................... 32
*Hall v. Ryan,* 957 F.2d 402, 406 (7th Cir. 1992) ........................................................................... 40
*Hassebrock v. Bernhoft*, 815 F.3d 334 (7th Cir. 2016) ................................................................ 21
*Jones v. Blanas*, 393 F.3d 918 (9th Cir. 2004) ............................................................................. 19
*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ............................................................. 38
*Kingsley v. Hendrickson*, 576 U. S. 389 (2015) ............................................................................ 24
*Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995) ................................................................ 39
*Malley v. Briggs*, 475 U.S. 335 (1986) ........................................................................................... 17
*Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553 (7th Cir. 2003) ............................................. 42
*Milwaukee & St. P.R. Co. v. Kellogg*, 94 U.S. 469 (1876) .......................................................... 38
*Mombourquette ex. Rel Mombourquette v.*, 469 F.Supp.2d 624 (W.D. Wis. 2007) .................... 40
*Palakovic v. Wetzel*, 854 F.3d 209 at 226 (3d. Cir. 2017) ............................................... 17, 30, 41
*Perez v. Oakland County*, 466 F.3d 416 (6th Cir., 2006) ..................................................... 30, 41
*Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016) ..................................................................... 29, 32
*Pyka v. Village of Orland Park*, 906 F. Supp. 1196 (N.D. Ill. 1995) ......................................... 38
*Pyles v. Fahim*, 771 F.3d 403 (7th Cir. 2014) ............................................................................... 30
*Rasho v. Walker*, 2022 WL 1801002 (C.D.Ill 2022) ..................................................................... 39
*Reales v. Consol. Rail Corp.*, 84 F.3d 993 (7th Cir. 1996) .......................................................... 21
*Reed v. McBride*, 178 F.3d 849 (7th Cir.1999) .............................................................................. 32
*Rogers v. Evans*, 792 F.2d 1052 (11 Cir. 1986) .................................................................. 25, 28, 32
*Sallie v. Thiel*, 23 Fed. Appx. 586 (7th Cir. 2001) ....................................................................... 25
*Sanville v. McCaughtry*, 266 F.3d 724 (7th Cir., 2001) ............................................................. 28
*Scarver v. Litscher*, 434 F.3d 972 (7th Cir. 2006) ....................................................................... 39
*Scott v. Harris*, 550 U.S. 372 (2007) ............................................................................................ 25
*Smith v. OSF HealthCare System*, 933 F.3d 859 (7th Cir. 2019) .......................................... 18, 19
*Soltys v. Costello*, 520 F.3d 737 (7th Cir. 2008) .......................................................................... 22
*Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618 (7th Cir. 2014) ..................................... 18
*Stockton v. Milwaukee Cnty.*, 44 F.4th 605 (7th Cir. 2022) ....................................................... 35
*Taylor v. Wausau Underwriters Ins. Co.*, 423 F.Supp.2d 882 (E.D. Wis., 2006) ....................... 39
*Thiele v. Norfolk & Western Ry. Co.,* 68 F.3d 179 (7th Cir.1995) ............................................. 24
*Thomas v. Cook County Sheriff's Dept.*, 588 F.3d 445 (7th Cir. 2009) ....................................... 41

*United States v. Nunez*, 532 F.3d 645 (7th Cir. 2008) ................................................... 25
*Wallace v. Baldwin*, 895 F.3d 481 (7th Cir. 2018) ........................................................ 29
*Wellman v. Faulkner*, 715 F.2d 269 (7th Cir. 1983) ...................................................... 29
*Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658 (7th Cir. 2016) ..................................... 30
*Whitley v. Albers*, 475 U.S. 312 (1986) ..................................................................... 25
*Wichita Falls v. Banc One,* 978 F.2d 915 (5th Cir. 1992) ..................................................... 19
*Woods v. Ind. Univ. – Purdue Univ.,* 996 F.2d 880 (7th Cir. 1993) ........................................... 21
*Woodward v. Correctional Med. Services of Illinois, Inc.*, 368 F.3d 917 (7th Cir. 2004) .......... 36

## **Statutes**

28 U.S.C. §1291 .................................................................................................... 1
28 U.S.C. §1331 .................................................................................................... 1
28 U.S.C. §1367(a) ................................................................................................ 1
42 U.S.C. §1983 .................................................................................................... 1
Fed. R. Civ. P. 15 .................................................................................................. 22
Fed. R. Civ. P. 6(b)(1)(B) ...................................................................................... 21
Fed. R. Evid. 801(d)(2)(A) ..................................................................................... 28

## **Other Authorities**

Jack McAllister, *Mental Illness in Prison & the Objective Unreasonableness in the Estelle Test*,
    Ind. J. L. & Soc. Equality 355, 355 (2020) ............................................................. 17
Thomas Jefferson to Thomas Paine, July 11, 1789, *The Papers of Thomas Jefferson*, vol. 15, 27
    March 1789–30 November 1789, ed. Julian P. Boyd. Princeton: Princeton University Press,
    1958, pp. 266–270) ............................................................................................. 14

## **STATEMENT REGARDING ORAL ARGUMENT**

Plaintiffs-Appellants request oral argument as they believe it could significantly aid the decisional process in this case.

# JURISDICTIONAL STATEMENT

On May 6, 2022, Plaintiffs-appellants, Daniel Christensen and Paula Christensen, as next of kin and special administrators of the estate of Donna Christensen ("Christensen"), filed a Complaint against defendants Vilas County, Sergeant Brent Wilmot ("Wilmot"), Jail Administrator William Weiss ("Weiss"), Sheriff Joseph Fath ("Fath"), and Kayla Anderson (now Ziemba) ("Ziemba"). (R. 1). On October 21, 2022, Plaintiffs-appellants filed an Amended Complaint to join Advanced Correctional Healthcare ("ACH"), their head nurse Linda Thayer ("Thayer"), and Physician Assistant Greg Scott ("Scott"), based on the inadequacy of Christensen's medical care. (See generally, R. 20). Plaintiffs' Amended Complaint asserts various state law claims and federal claims pursuant 42 U.S.C. §1983 against the defendants for violations of the Eighth and Fourteenth Amendment. (Id.). As a result, the district court had subject matter jurisdiction pursuant to 28 U.S.C. §1331 over federal constitutional claims, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a)

On December 7, 2023, the district court granted all defendants'-appellees' motions for summary judgment on Plaintiffs'-appellants' federal claims, and dismissed the state law claims without prejudice to refiling in state court, and entered Judgment for defendants. (R. 85, RA 23; R. 86, RA. 48). On January 5, 2024, Plaintiffs-appellants filed the instant notice of appeal. (R. 93). This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because it is an appeal of a final order of a district court that disposed of all claims in the district court.

## <u>STATEMENT OF ISSUES ON APPEAL</u>

This appeal raises the following procedural issues:

1.        Did the district court unreasonably deny Plaintiffs' timely motion for additional discovery to respond to ACH defendants' motion for summary judgment?

2.        Did the district court unreasonably deny Plaintiffs' motion for leave to supplement the summary judgment record with a declaration from jail psychology expert, Dr. Amber Carda, three days after deadline, due to the expert's unforeseen travel schedule where she lacked means of communication?

3.        Did the district court reasonably deny Plaintiffs' motion for leave to amend their Complaint to add ACH's Dr. Melissa Caldwell and Vilas County's Samantha Malone as additional parties?

In addition, this appeal raises the following substantive issues:

4.        Did the district court properly grant summary judgment on Plaintiffs' §1983 claim on grounds there was no evidence of a constitutional violation as to:

      a.    Wilmot's unreasonable use of force that resulted in Christensen's prolonged solitary confinement;

      b.    Ziemba's lack of medical care for Christensen's symptoms of mental illness and suicidality; or alternatively, woefully inadequate medical care that constitutes no care under the circumstances.

5.        Did the district court properly grant summary judgment on the basis there is no evidence a constitutional violation was a substantial factor in causing Christensen's pain, suffering, and death by suicide?

6.        Did the district court properly grant summary judgment on the basis there is no evidence that Defendants were deliberately indifferent to a "substantial risk" of suicide?

## STATEMENT OF THE CASE

On October 1, 2020, Christensen, a 20-year-old Native-American, voluntarily turned herself into the Tribal Police, who transferred custody to Vilas County Jail on a probation hold. (R. 85, p. 1, RA 22; 59-6 p.1; R. 59-46, p. 1). From Christensen's prior stay at Vilas County Jail in early 2020, she was noted to have taken medication for depression, and reported having tried to attempt suicide in a variety of methods. (R. 59-3, SA. 3; R. 59-5, SA. 4; R. 59-6, SA. 1). She reportedly had "high moods and low moods" since she was 14 years-old, along with issues with anger management. (R. 59-8, SA. 5).

On the subject stay, Christensen did not raise suicide concerns upon booking but was noted to have drugs in her system causing withdrawals. (R. 37-1, p. 28). An officer placed a request for her to receive medical attention for withdrawals, but no treatment was ever provided to address her symptoms.[1] (R. 59-13). Christensen registered a high temperature, a COVID test was ordered as a result, and she was placed into isolation in a medical segregation unit as a means of quarantine on October 4, 2023. (R. 59-14; R. 56-46, p. 2).

On October 8, 2024, Officer Sam Malone ("Malone") testified she knew that Christensen was having a hard time being alone in segregation. (R. 59-17; R. 59-18, p. 66 [8:13]). Christensen broke down and started kicking her door and yelling for someone to get her out. (R. 59-16; R. 59-17). Christensen covered her cell window with toilet paper, which Malone knew is something inmates can do to provide an opportunity to harm themselves. (R. 59-18, p. 69 [3:10]). Malone was concerned that Christensen was so agitated that she might attempt to harm herself. (R. 59-17; R. 59-18, p. 66[15:22]). Despite having a video feed, Malone and her Supervisor, Sergeant Wilmot, came to Christensen's cell when she was lying on the floor resting, covered in

---

[1] Christensen did not receive any medical evaluation until her initial medical appraisal was completed on October 16, 2020, a day past the jail's policy. (R.59-45; R. 37-1, p. 14-16).

her blanket. (R. 59-19; R. 59-20). After Malone entered her cell, Christensen woke and threw what appears to be an empty Styrofoam food container outside her door, which inadvertently hit Wilmot's boot where he was standing outside the doorway. (R. 59-16 [37:45-38:30] (single view video); R.59-20 [37:45-38:30] (three view video)).

In response to the Styrofoam, and without any verbal request to move, Wilmot grabbed the top of the mat Christensen was on and pulled it up with enough force that Christensen stumbled forward directly into Wilmot's space as she rose to her feet. (Id., SA. 6). In response, Christensen placed her hands on Wilmot to balance herself and regain her space. (Id.; R. 85, p.14; RA 36). This all happened very quickly. (R. 59-16; R.59-20). Christensen reported in a sworn statement to her probation officer that she did not see Wilmot standing there, and then panicked because she had been in prior traumatic situations. (R.59-23, p. 3; SA.9). Wilmot proceeded to leverage his body weight directly on top of Christensen to restrain her following the incident. (R. 59-20).

After being restrained, Christensen stated, "like that's gonna stop me from killing myself." (R. 59-16; R.59-20; R.24, p.1). Wilmot asked if Christensen was going to kill herself, and she said "watch me." (Id.). Christensen told Malone and Wilmot she had voices in her head telling her to kill herself for a while; she couldn't be alone in the cell anymore with the voices; and they shouldn't have followed her into the jail. (Id.). When Christensen was asked why she did not report the voices, she said, "why would I report, when this is going to happen." (Id.). Christensen later explained to her probation officer that she did not want to end up in the "turtle suit," referring to the suicide smock. (R.59-23, p. 3-4; SA.9-10). Christensen claimed to be only normal when "on meth"; that she is bipolar and should be taking medication to address it; and she wanted vegan meals because "people are out and out eating people." (Id.). Christensen was

obviously and severely disturbed throughout the time she was placed in the restraint chair, after refusing to don the suicide smock. (R. 28 (video of restrain chair)). Malone testified that she believed Christensen was serious about committing suicide, and both her and Wilmot acknowledged that she was obviously in need of treatment for obvious symptoms of mental illness. (R. 59-18, p. 87-88 [1-25:1-3]; R. 59-2, p. 74 [1:6], 75, [1:6]; 84 [4:9]).

Because Christensen's hands made contact with Wilmot, Vilas County Jail Policy allowed him to impose the maximum available discipline of (10) days of solitary confinement, which itself initiated an additional twenty (20) days after Christensen was automatically reclassified as a MAX security inmate[2], for a total of thirty (30) days where Christensen was allowed out of her small cell, and into the day room, for one hour a day. (R. 59-2, p. 37[1:15], p. 84[13:25]-85[1:5]; R. 59-26, p. 5). Wilmot filled out a jail log claiming that Christensen threw her Styrofoam container hitting him in the leg and "got shit all over his leg" and then she got up and pushed him. (R. 59-24; SA.11). The parties dispute the accuracy of the jail log and Wilmot's description compared to the video evidence in these respects. (R. 59-20; R.59-16; R. 73, ¶68-70). Wilmot referred a felony battery charge against Christensen to the Vilas County Sheriff's Office, claiming that Christensen had broken a remote, threw a tray "full of food" and shoved Officer Wilmot (R.59-2, p. 77 [4:25]; R.37-8, p. 15 [10:25], p. 16. [1:19], p. 28 [6:10]). A police officer came to the jail while Christensen was being observed in the restraint chair and read Christensen her Miranda rights, but she did not want to speak with him. (R.37-8, p. 16-17).

On October 6, 2020, Wilmot served Christensen with disciplinary papers for ten (10) days of administrative segregation without privileges, and sought a waiver of Christensen's right to a full due process hearing. (R. 59-30, SA.13; R. 59-32). Wilmot promised that if Christensen

---

[2] Maximum security inmates are defined as "Inmates posing a threat to the community or institutional safety" who are convicted of a violent crime. (R.59-26, p. 4-5).

agreed to sign the disciplinary papers, the disciplinary segregation would start immediately. (R. 59-32). Christensen was hesitant to sign the waiver of a due process hearing, stating "ten days is a long time to be alone." (Id.). In response, Wilmot promised that, if Christensen signed off on due process, he would take her out of isolation and "put her back by people" once her COVID test came back. (Id.; R. 59-2, p. 101 [5:16]). Wilmot did not tell Christensen she would be further re-designated as a MAX inmate, reserved for violent inmates, including solitary confinement for an additional twenty (20) days. (R. 59-2, p. 102 [3:11]; R. 32, RA.1). Based on Wilmot's promise, Christensen signed the discipline to waive a full due process hearing. (R. 59-30, SA. 13). Wilmot signed the form as the one involved in the use of force and the supervising officer, which he was not. (Id.; R.59-12, p. 14[9:18]). Weiss testified he watched the video to evaluate the use of force and punishment but had no discussions with Wilmot, did not take any responsive action, and he did not inform Sheriff Fath. (R. 59-12, p. 14 [2:8], 39 [4:22], 42[21:25]-43[1:14], p. 66[7:14]). Weiss testified that Wilmot's conduct was consistent with Vilas County's policies on use of force and de-escalation. (R. 59-12, p. 42[6:20]; R.26, p. 8-10).

On October 7, 2020, Christensen was evaluated by social worker Ziemba while on suicide watch, who was the designated Qualified Mental Health Professional to provide care for inmates with symptoms of mental illness at the jail. (R. 59-12, p. 18 [9:18]; R. 73, ¶112). Weiss testified that he relied entirely upon ACH to determine whether Ziemba was qualified for the job. (Id. at p. 125[8:25], p. 126[1:13]). Ziemba was not fully licensed in a clinical specialty as required by Vilas County's job description; instead, she was using her "supervised" hours working at Vilas County Jail to work towards getting fully licensed. (R. 59-21; R. 59-11, p. 20 [4:25]). Accordingly, at all relevant times, Ziemba was acting in her capacity as an advanced

practice social worker. (R.59-21, p. 27 [13:17]).

Ziemba had her hours supervised by ACH's psychologist Melissa Caldwell ("Caldwell"), who was never present to supervise Ziemba in real time, and never reviewed any of her work product. (R.59-11, p. 25 [4:25], p. 26 [1:25], p. 57 [10:25] -58 [1:17]). Caldwell told Weiss and Ziemba that she was qualified to provide medical care for inmates with mental illness for Vilas County. (R. 59-12, p. 126 [16:23], 128 [9:16]; R.59-11, p. 90 [4:21]).

On October 7, 2020, Christensen told Ziemba that she had been hearing voices "for a while" that told her to kill herself, reported thoughts of self-harm "all the time," but denied any active plan to do so. (R. 59-36, SA.14). Christensen also relayed a long history of suicide attempts, which Ziemba was aware of, and believed was authentic information. (R. 59-11, p. 109[10:25]). Ziemba had access to Christensen's jail medical records and would review them. (Id. at p. 84[6:12]-85[7:19]). Ziemba kept Christensen in the suicide watch unit for the remainder of the day. (R. 59-29, p. 1-3, SA. 15-17). While in suicide watch, one officer briefly spoke to Christensen, and she otherwise remained in her bunk. (R. 59-29, SA. 15).

On October 8, 2020, to make room for another suicidal inmate, Christensen was removed from the suicide watch room and moved to a holding cell, where she then saw Ziemba. (R. 59-37). In a meeting of approximately fifteen minutes, Christensen told Ziemba that she was going through withdrawals but had no more thoughts of self-harm. (R. 59-38, SA. 23; R. 59-29, p. 6, SA. 20). Ziemba's notes did not contain any medical analysis into the cause of Christensen's symptoms of mental illness. (R.59-38, SA. 23).

Ziemba released Christensen from suicide watch after this lone visit. (R. 59-29, SA. 15). Ziemba released Christensen with no referral for treatment, no medical evaluation, and no precautions against the risk that Christensen would carry out on her previous threat to kill

herself. (R.59-11, p. 66[1:24]; R. 59-38). The name of ACH's Physician Assistant Scott was written on the suicide release form, despite Ziemba never speaking to him regarding Christensen, and Scott never provided any services for Christensen. (R. 59-41; R.59-11, p. 135 [14:25]- 136 [1:9]). Ziemba testified that she never signed off on the release form as the practitioner, and did not know why Scott would be involved. (R.59-11, p. 135 [10:17]). Weiss testified that Scott should have signed off on the release from suicide watch, and he should not be signing off if he does not evaluate her. (R.59-12, p. 97[7:22], 98[11:15]. Weiss testified that whether a suicidal inmate would be evaluated for mental illness was entirely up to ACH. (R.59-12, p. 98[18:25], 99[1:8]).

On October 12, 2020, Ziemba performed a mental health assessment of Christensen. Ziemba admittedly did not conduct or document a treatment plan to address Christensen's mental health symptoms, including recent suicidality, and could not make a referral to provide medication. (R. 59-11, p. 33 [3:25]- 34[1:14], 40 [2:8], 64[12:24], 65[21:25], 66[1:24], 107 [9:17]). Ziemba admittedly could only provide "support and encouragement," neither of which are evidence-based interventions to address Christensen's symptoms of mental illness including suicidality. (R.59-11, p. 42[6:17], p. 135[23:25]-136 [1:9]).

Ziemba issued a "provisional diagnosis" of "situational distress" and "polysubstance abuse disorder," noting "trauma" from her incarceration. (R. 59-42, SA. 24; R. 59-11, p. 33 [3:25]- 34[1:5]). Ziemba disagreed with Christensen's contention that she was bipolar, but rather noted a "mental health need" that was "not serious," so no precautions were deemed necessary. (R.59-42, SA. 24; R. 59-11, p. 137 [9:24]). Ziemba again only provided "support and encouragement." (R.59-42, SA. 24). On October 16, 2020, Christensen first saw ACH's nurse Thayer for her mandatory initial medical visit, which was delayed a day past the jail's policy. (R.

59-45). She was noted to be guarded and responded negatively to past suicide attempts, contrary to her documented history. (R. 59-45, p. 1-2). On October 20, 2020, Ziemba saw Christensen for a mental health round and Christensen raised no concerns. (R.37-1, p 19). Despite Wilmot's promise to put Christensen "back by people", she remained in solitary confinement, away from all other inmates as the only person in "D" block for the final 10 days of her life (October 15, 2020 through October 26, 2020). (R. 59-33).

Christensen fashioned a noose out of her bedding and tied it to the post of her bunk bed within her cell to kill herself. (R. 59-27, SA. 25). After her death, jail personnel photographed scars on her wrists from self-harm. (R. 59-48, SA. 26).

On May 6, 2022, Plaintiffs commenced this lawsuit against Vilas County, Sheriff Fath, Jail Administrator Weiss, Officer Wilmot, and Kayla Anderson (now "Ziemba"). (R. 1). On October 21, 2022, Plaintiffs timely filed an Amended Complaint to add ACH and other healthcare providers connected with Christensen's care. (R. 20). During the initial round of depositions, on April 17, 2023, Weiss testified that psychologist Caldwell was responsible for staffing on behalf of ACH, although she was not listed on Vilas County and ACH's initial disclosures. (R. 59-12, p. 18[12:25], 19[1:4], 128[9:16]; R.82-6; R.82-7). On April 25, 2022, Ziemba further testified that Caldwell was responsible for training and supervising her hours towards becoming a licensed clinical social worker at the time Christensen was in her care. (R. 82-5, p. 25 [4:25]-26 [1:25]).

### A. The District Court Grants a Joint Motion to Extend the Dispositive Motion Deadline and then "STRUCK" the Scheduling Order.

Due to the delays in working through written discovery disputes and the initial round of depositions (See R. 82-3, p. 1-15, SA. 83-97), the parties filed a joint motion to permit time for additional discovery before summary judgment motions set for April 17, 2023. (R. 31). On April

18, 2023, the court issued a text only order stating the parties provide no reason why they were unable to schedule the depositions sooner, which ordinarily would require denial of the motion, but the trial was scheduled on the same date as a complicated criminal trial, so the trial deadlines had to be rescheduled. (R. 32, RA. 1). The district court granted the stipulated motion for an extension of time, and stated the scheduling order was "STRUCK, and directed a telephone conference with the magistrate to set a new trial date and related deadlines." (Id.). On May 18, 2023, at the status conference, counsel advised they had interpreted the court's April 18, 2023 text-only order to have struck the entire Scheduling Order, including the amended May 19, 2023 dispositive motion deadline in the Joint Motion for Extension of Time. (R. 33, RA. 2). The magistrate disagreed, noting that "no summary judgment motions are coming in on May 19, 2023 because neither set of defendants has prepared one," and "what happens next depends on how the presiding judge wishes to proceed." (Id.). In a further text only order, Judge Peterson then ordered the summary judgment deadline remained May 19, 2023, "and would not be extended." (R. 34, RA. 3). The next day, Defendants each filed for summary judgment to trigger the briefing schedule. (R. 36; R. 44).

Plaintiffs opposed the motion by Vilas County on the basis of written discovery, the video evidence and the initial round of recently completed depositions. (R. 53 - R. 60). As to Defendant ACH, Plaintiffs additionally opposed the motion under Rule 56(f) on the basis of the need for additional time to incorporate the testimony from depositions of parties Scott and Thayer that had transcripts pending and not available to be introduced into the record, and other key witnesses, including Caldwell, who was in the process of being scheduled. (R. 49-R. 51, SA. 27-44).

On June 7, 2023, the district court rescheduled the discovery and trial deadlines, with a

new discovery deadline of February 23, 2024, and trial on April 8, 2024. (R. 48, RA. 4).

On June 12, 2023, despite substantially expanding the schedule, the district court denied Plaintiffs' motion for leave to conduct additional discovery. (R. 61, RA. 5). The district court's Order held Plaintiffs did not specify how much time was required; waited too long to depose Caldwell in light of the "known" summary judgment deadline; and failed to satisfy the court of why the depositions of Caldwell and other party Defendants were needed to effectively respond to summary judgment. (Id. at p. 1-3, RA. 5-7).

### B. Plaintiffs File a Motion to Extend Time for Filing an Affidavit of their Expert, Dr. Amber Carda, Two Days After the Summary Judgment Deadline.

Among the consequences of the shotgun summary judgment deadline, Plaintiffs' counsel had a miscommunication with their jail psychology expert, Dr. Amber Carda ("Carda"), due to her unknown work travel without available means of contact, which prevented Plaintiffs from finalizing Carda's evidentiary support by the summary judgment deadline. (R. 62-R.64, SA. 45-67). Ultimately, the Carda Declaration was filed two days late, along with a motion to extend the deadline. (Id.). Without the ability to communicate with Carda, Plaintiffs explained they believed there was no choice but to remove her evidentiary support from their briefing, including numerous highly relevant expert opinions. (R. 64, p. 2, SA. 46). In particular, Carda's opinions included: (1) Christensen endorsed overt signs of an acute mental health crises, as a result of her confinement; (2) Christensen had a known (and documented) history of suicidal ideations and self-harm, as indicated by prior suicide attempts, and also command hallucinations telling her to kill herself; (3) Ziemba failed to provide any medical evaluation or treatment, and worse put her into solitary confinement without a specialized follow up and treatment plan that would present a substantial risk of harm, which was disregarded. (R. 64-1, p. 4-7, RA. 14-17). Plaintiffs contended this highly relevant evidence should be in the record.

In denying Plaintiffs' motion to extend the deadline for summary judgment filings, the district court reasoned:

> "I'd often accept a filing that was only a few days late. But this one doesn't stand on its own: the declaration would be useful only if it were cited in the plaintiffs' proposed facts and, probably, explained in their opposition brief. If plaintiffs simply submitted the declaration now, defendants wouldn't know how to respond to it and the court wouldn't know what to make of it. Plaintiffs would have to re-submit their entire summary judgment opposition to make use of the declaration."

(R. 65, RA. 9). Plaintiffs filed a motion for reconsideration, arguing the district court's ruling failed to analyze the relevant standard as to whether Plaintiffs had shown excusable neglect. Further, Plaintiffs explained how the lack of information on the status of the Declaration made it difficult to know how to proceed without any concrete reason to seek a good faith extension, as the district court suggested, which also would have further risked dismissal on that ground. (R. 67, p. 4, SA. 73). Plaintiffs instead chose to remove all references from its briefing, wait to hear from Carda, and then immediately sought relief, which was a reasonable and good faith option. (R.67, p. 3, SA. 72).

The district court denied the motion for reconsideration, ruling that Plaintiffs could have avoided this situation in at least three ways: (1) Carda could have prepared her evidence sooner; (2) Plaintiffs could have immediately sought relief from the court to suspend the briefing schedule; or (3) submit an amended brief and proposed findings of fact that incorporate the declaration, so Defendants and the court would know how Plaintiffs are relying on the declaration. (R. 72, RA. 17). The court stated, because Plaintiffs had not submitted amended summary judgment materials, and requested another five days[3] to do so, it was too late because it would require Defendants to redo their work. (Id.). Accordingly, the district court did not

---

[3] In fact, Plaintiffs asked for one (1) day but no longer than five (5) days. (R. 67, p. 4, SA. 73).

consider the Carda Declaration as part of the summary judgment record, and relied in part on its absence to reach its ruling.

### C. Plaintiffs File a Motion to Amend to their Complaint to Add Caldwell and Malone to the Suit.

On June 27, 2023, Plaintiffs filed a motion to amend their Complaint to add Corrections Officer Malone (who observed Wilmot's use of force and conformed her jail log to the same account as Wilmot without intervention) and ACH's Caldwell (for her role in training Ziemba and staffing Vilas County without any medical provider for symptoms of mental illness). (R. 80-82). Plaintiffs argued that the allegations against Malone rely on the merits of the underlying claim against Wilmot, and therefore no prejudice existed related to the summary judgment deadline. (R. 81, SA. 75). Further, Plaintiffs pointed to the substantial delays that occurred during written discovery not of Plaintiffs own making to justify the late filing (R. 82-3, p. 1-15, SA. 83-97) and the potential amendment would not be futile based on discovery to date. (R. 82-2, 5). On June 29, 2023, the district court denied Plaintiffs' motion to amend the Complaint based on prejudice that would result due to the closure of summary judgment briefing. (R. 83, p. 3, RA. 20).

Following denial of Plaintiffs' procedural motions above, discovery proceeded to include numerous depositions with the summary judgment record closed, from May 19, 2023 until December 7, 2023 (R.88-2, p. 2). On December 7, 2023, the district court granted summary judgment to all Defendants on the Plaintiffs' federal constitutional claims, and dismissed the state law claims without prejudice. (R. 85, RA. 23). In particular, the district court ruled there was no evidence to support a constitutional violation related to Wilmot's unreasonable use of force, no evidence of a constitutionally protected right for Christensen to be free from segregation related to due process for Wilmot's punishment, no evidence ACH defendants failed

to provide Christensen with constitutionally required medical care for her obvious symptoms of mental illness and suicidality, and no evidence to establish causation of damages from any alleged constitutional violation. (See id.). As part of its ruling, the district court ruled that Christensen's statement to her probation officer as to her version of events of the altercation with Wilmot would not be admissible under any exception to the hearsay rule. (Id. at p.5, n. 3, RA. at 28). The court entered Judgement that same day. (R.86, RA. 48).

## SUMMARY OF ARGUMENT

"I consider [trial by jury] as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution." (From Thomas Jefferson to Thomas Paine, July 11, 1789, *The Papers of Thomas Jefferson*, vol. 15, 27 March 1789–30 November 1789, ed. Julian P. Boyd. Princeton: Princeton University Press, 1958, pp. 266–270). For the jury system to fulfill its crucial role, litigants must have a fair opportunity to marshal sufficient evidence before a decision is made as a matter of law, and then cases involving material issues of fact must be left for the jury.

The district court abused its discretion by failing to apply the proper procedural standards to prevent the movement of its summary judgment deadline, which effectively nipped this case in the bud. After the district court declared the "STRUCK" Scheduling Order did not include the summary judgment deadline the day prior to the deadline, it ignored how that stop and start would prejudice the interests of justice in terms of the summary judgment record. Even notwithstanding the confusion, there was no rational basis to hold the parties to the deadline under the circumstances, given the demonstrated need for additional time based on the progress of discovery to date, good faith of counsel in attempting to comply with the deadline, the large slack in the schedule due to the court's rescheduling of the trial to allow the parties to complete

14

remaining necessary discovery and permit the briefing to proceed in an orderly manner. Yet, on each of Plaintiffs' requests for leave, the district court made its ruling in a text only order, without opposition or hearing, within mere days of the submission. The district court, in failing to acknowledge the parties' confusion, appears to have made up its mind not to lose the summary judgment deadline. Further, the district court held onto the deadline despite the clear prejudice it had on the record, effectively deciding this case on a technicality instead of the merits, contrary to the interests of justice. Reversal as to all defendants is required to give Plaintiffs the opportunity to present their full case, irrespective of the merits of this record.

As to the merits of Plaintiffs' Section 1983 claims on the present record, the district court improperly decided issues of fact as to constitutional violations and causation, as well as the issue of substantial awareness to suicide. Here, a reasonable jury could find two unconstitutional violations were a cause of cruel and unusual punishment to Christensen, in the form of wanton mental anguish, and ultimately suicide, based on a logical sequence of cause and effect.

First, Wilmot used unreasonable force by pulling the blanket up to thrust Christensen involuntarily up into his space to provoke physical contact. Wilmot's action is analogous to one officer unnecessarily pushing an inmate into another officer. Further, Wilmot used the resulting contact as a basis to send Christensen to prolonged solitary confinement, despite his knowledge of her suicidality and symptoms of mental illness that made Christensen highly vulnerable to solitary conditions, as he personally observed. Wilmot's malicious intent to Christensen is evidenced by his fabrication of his jail log to justify his initiation of force to make Christensen the aggressor contrary to jail video evidence, as well as his misrepresentation that he would put Christensen back "by people" to secure a waiver of due process, only to leave her completely alone in an empty block of the jail where she eventually committed suicide. The video and other

circumstantial evidence supports a jury question whether Wilmot's use of force was unreasonable (*i.e.*, maliciously to cause harm to Christensen), and the extent to which it was a substantial factor in actually causing injury to Christensen.

In parallel, Vilas County and ACH failed to satisfy their obligations to provide constitutionally required medical care and treatment for Christensen's obvious mental illness and suicidality. Despite Christensen's known history of mental illness, suicide attempts, recent threat of suicide and voices in her head telling her to kill herself for months. ACH's social worker, Ziemba, released Christensen from suicide watch after a short standalone visit, without any medical or psychological analysis, and instead relied completely upon Christensen's glib self-reporting she was all better. Ziemba herself admitted that she did not provide inmates with a medical diagnosis or treatment plan, and further had no ability to refer Christensen for medical treatment to include psychotropic medication as needed. Instead, Ziemba dispensed "support and encouragement" to Christensen, as she did on Christensen's prior stay. Christensen's treatment was borne of Vilas County and ACH policies, which included staffing an unlicensed provider contrary to their own job description, maintaining a policy where Physician's Assistant Scott would sign off on Christensen's suicide release without any evaluation of her symptoms of mental illness and suicidality, and inadequate training, supervision, and performance without any medical interface related to solitary confinement for inmates with mental illness. A reasonable jury could find Ziemba, ACH and potentially others participated in setting the policy that subjected Christensen to cruel and unusual punishment pushing her to the brink of suicide.

It is worth noting the largest providers of psychiatric care are not hospitals, but rather prisons and jails. Jack McAllister, *Mental Illness in Prison & the Objective Unreasonableness in the Estelle Test*, Ind. J. L. & Soc. Equality 355, 355 (2020). This case is where the "rubber meets

the road" for society to draw the constitutional line (and safety net) for medical care required for mentally ill citizens in places of incarceration, particularly involving prolonged solitary confinement. Remanding this case will help ensure adequate, and actual, medical treatment, rather than lip service, is provided to prisoners so they can get released with limited recidivism.

Critically, the failure to prevent suicide is not the only thrust of plaintiffs' constitutional violation claims. Naturally, this framework does not preclude other types of constitutional claims, even if those claims also relate to the individual who committed suicide while in prison. *See Palakovic v. Wetzel*, 854 F.3d 209, 224-25 (3rd Cir., 2017). Fundamentally, the district court failed to interpret Section 1983 "against the background of tort liability that makes a man responsible for the natural consequences of his actions," potentially to include suicide. *See Malley v. Briggs*, 475 U.S. 335, 344, n.7 (1986). A reasonable jury could find that the natural consequences from the unconstitutional actions of Ziemba and Wilmot interacted with the other to create the tragic outcome in this case. Regardless of whether plaintiffs can present evidence to support a failure to prevent suicide claim, the other constitutional violation claims should proceed to the jury.

Finally, despite the lack of any documented warning signs immediately prior to Christensen's suicide, a jury could still find defendants were aware of and were deliberately indifferent to a substantial risk of harm to Christensen under the totality of the circumstances. A reasonable jury could find that Wilmot deliberately disregarded that his use of force and subsequent punishment of solitary confinement would be highly painful for Christensen and likely to lead to self-harm under the circumstances. Weiss was aware of Wilmot's actions, did nothing, and has since condoned them as consistent with his jail policy. Similarly, ACH's Ziemba was aware that Christensen's mental illness was obvious and untreated, and with her

history of chronic and acute suicidality, she presented a substantial risk to herself. Because there is evidence that such officials knew of Christensen's particular vulnerability to suicide, the Fourteenth Amendment imposes on them an obligation not to act with reckless indifference to that vulnerability. Yet, defendants kept Christensen in solitary confinement alone with the suicidal command voices in her head, without any access to medical treatment or taking any other safety precautions. Under these unique facts, there is sufficient evidence the defendants were deliberately indifferent to Christensen's substantial risk of mental anguish and suicide for the jury.

## ARGUMENT

### I. THE COURT UNREASONABLY REFUSED TO ALLOW PLAINTIFFS' ADDITIONAL DISCOVERY TO OPPOSE SUMMARY JUDGMENT.

Appellate courts review decisions on Rule 56(d) motions for abuse of discretion. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 622–23 (7th Cir. 2014).

Under Fed. R. Civ. P. 56(d), a non-movant may obtain relief to obtain affidavits or take discovery upon the identification of: (1) the probable facts that are unavailable, (2) state why these facts cannot be presented without additional time, (3) identify past steps to obtain evidence, and (4) state how additional time would allow for rebuttal. *Smith v. OSF HealthCare System*, 933 F.3d 859, 864 (7th Cir. 2019). Courts have reversed denials on equitable grounds as being "clearly against reason" when the motion for summary judgment is filed before the close of discovery, especially if there are pending discovery disputes or relevant discovery to take place. *Id.* at p. 865; *Wichita Falls v. Banc One*, 978 F.2d 915, 920 (5th Cir. 1992) (it is inequitable to pull out the rug by denying discovery germane to the pending summary judgment motion); *Jones v. Blanas*, 393 F.3d 918, 930 (9th Cir. 2004) (Rule 56(d) motions requesting time for additional discovery should be granted "almost as a matter of course" unless the non-moving party has not

diligently pursued discovery). On the other hand, the mere fact that discovery is incomplete is not enough to prevent summary judgment where a party shows only hope that more fishing might net some good evidence; in other words, nothing more than speculation as to whether such discovery would be 'fruitless' with respect to the proof of a viable claim. *Id.* at 864.

For example, in *Smith v. OSF Healthcare System*, this Court ruled that the district court abused its discretion in denying a Rule 56(d) motion where summary judgment was filed long before discovery was to close, plaintiff was pursuing discovery in a diligent, sensible and sequenced manner, and the pending discovery was material to the summary judgment issues. 933 F.3d at 861. This Court noted the district court's earlier case management and scheduling decisions took an unduly narrow view of facts relevant to the case, and overlooked earlier delays caused by defendants. *Id.* at 864-65. In response to the argument that enough time existed to complete relevant discovery, this Court pointed to plaintiffs' sensible approach to staging discovery so that, for example, document discovery would be complete before taking depositions of key witnesses, especially in "paper heavy" cases. *Id.* at 868. Further, the lack of motions to compel discovery served to emphasize, given the time required for meet and confer requirements, how premature the summary judgment decision was, nine (9) months prior to the close of discovery. *Id.* at p. 867-868.

Under this standard, the district court abused its discretion denying Plaintiffs' Rule 56(f) motion requesting additional time for discovery against ACH. As an initial matter, all counsel acknowledged the summary judgment deadline was not "known" as the district court resolutely maintained, which naturally impacted their urgency to rush discovery on that basis. As a result, the deadline initiated briefing in shotgun fashion during the still nascent stages of case discovery and theory development, before the completion of party depositions and numerous other key

witnesses, much less completion of expert analysis and disclosures by the agreement of the parties.

Even then, Plaintiffs explained why not having the depositions of party defendants who were seemingly involved with and responsible for Christensen's care, or the person who staffed, trained and supervised Ziemba, would be expected to yield relevant evidence to their allegation of a failure to provide required medical care. Despite the straightforward nature of the argument, the court remained willingly ignorant of the potential relevance of this discovery. Of course, Plaintiffs cannot be expected to specifically know what a witnesses is going to say, nor play out the detailed areas of the forthcoming examination. On the other hand, Plaintiffs diligently pursued discovery, including written discovery disputes without the need for court involvement, and the depositions of the initial round of defendant depositions. Like *Smith*, the district court ignored the natural staging of a case of this size and complexity against two parties, whereby Plaintiffs would naturally want to obtain all the required information from written discovery before initiating party depositions. And crucially, any delays were not of Plaintiffs' making. (R. 61). These efforts were also ignored by the district court. Last but not least, the district court's strict adherence to the summary judgment deadline was wholly unnecessary where plenty of time existed to permit additional fact and expert discovery into early 2024 because the district court struck the Scheduling Order for another trial.

In sum, like *Smith*, this Court should reverse and remand this case to the district court to provide a fair opportunity to complete the relevant factual and expert discovery before summary judgment, particularly in this case involving a loss of life and important constitutional policy.

## II.  THE COURT UNREASONABLY REFUSED ALTER THE SUMMARY JUDGMENT RESPONSE DEADLINE TO PERMIT THE CARDA DECLARATION INTO THE RECORD BASED ON A SHOWING OF EXCUSABLE NEGLECT.

A district court's refusal to grant an extension of time is reviewed for an abuse of discretion. *Reales v. Consol. Rail Corp.*, 84 F.3d 993, 996 (7th Cir. 1996).

Fed. R. Civ. P. 6(b)(1)(B) provides that when a deadline that has already passed, the court should deny a motion for leave unless the movant can show that the failure was the result of "excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). The determination whether a party's neglect is excusable is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission," including: (1) the danger of prejudice; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; (4) and whether the movant acted in good faith." Fed. R. Civ. P. 6(b)(1)(B); *see Hassebrock v. Bernhoft*, 815 F.3d 334, 341 (7th Cir. 2016). Again, it is fundamental that cases should, in the main, be decided on the merits, not on technicalities. *Woods v. Ind. Univ. – Purdue Univ.,* 996 F.2d 880, 884 (7th Cir. 1993).

In this case, the district court abused its discretion by denying Plaintiffs the opportunity to file the Carda Declaration in opposition to summary judgment because it did not analyze the relevant factors in the "excusable neglect" standard. First and foremost, the Carda Declaration is highly relevant opinion from an extremely well qualified jail psychologist who reviewed the discovery materials available to date to evaluate Christensen's treatment, which directly bears on whether defendants met their constitutional obligations in that regard. Second, there is no prejudice to defendants in getting the Carda Declaration a mere two days later and sufficient time remained so as not to prejudice the defendants. Second, the length of the delay is very brief, and its potential impact on the judicial proceedings minimal. The Court could easily have permitted amended briefing to accommodate the new information. Third, equity supports a brief extension where counsel's inability to comply was due in part to a shotgun deadline and unforeseen work

conflict, which should not be outcome determinative. Fourth, after the situation was clarified, Plaintiffs' counsel acted expeditiously and in good faith to rectify the late filing only a few days after the response was due. Admittedly, Plaintiffs' counsel was not entirely clear on the preferred procedure to follow to enter the Carda Affidavit into the record to the satisfaction of the district court, as there is no express framework. Plaintiffs' counsel's lack of foresight in this regard should not, however, cause Plaintiffs to lose admissible expert evidence that would otherwise entitle them to their day in court. The district court's abuse of discretion directly impacted summary judgment in favor of Vilas County and ACH, once again without affording Plaintiffs a fair opportunity to present their entire case on the record.

### III. THE COURT UNREASONABLY DENIED PLAINTIFFS' MOTION FOR LEAVE TO AMEND TO JOIN ADDITIONAL PARTIES.

The denial of a motion for leave to amend a complaint is reviewed for an abuse of discretion in refusing to grant the leave without any justifying reason." *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008).

Fed. R. Civ. P. 15 reflects a liberal attitude towards the amendment of pleadings, but courts in their sound discretion may deny a proposed amendment if the moving party has unduly delayed in filing the motion, if the opposing party would suffer undue prejudice, or if the pleading is futile. *Id.* Delay on its own is usually not reason enough for a court to deny a motion to amend, but the longer the delay, the greater the presumption against granting leave to amend. *Id.*

In this instance, the district court denied the motion due to prejudice associated with the passed deadline for filing motions for summary judgment. (R. 83, p. 2-3, RA. 19-20). Again, the ambiguous summary judgment deadline should not be outcome determinative as to the liability of arguably the most culpable actor. The Court's text only order that ostensibly "STRUCK" the

scheduling order, including the summary judgment deadline, and it is reasonable to infer the original summary judgment deadline would not be the only deadline held over. In addition, the district court ignored Plaintiffs' diligence to prosecuting various discovery disputes without court involvement, and the natural staging of such a case against two groups of defendants. (R.82, 82-4, SA 98). On March 9, 2023, Plaintiffs wrote to outline the significant progress made working through numerous discovery disputes (R.82-3, p. 8, SA. 90), and obtained supplemental discovery responses from Vilas County on December 20, 2022 and March 22, 2023, before taking the first round of fact depositions less than a month later, which disclosed the facts to support the requested amendment. (Id. at p. 12, 15). Upon the clarification of the summary judgment deadline, Plaintiffs filed their response by June 12, 2022, and filed their Motion to Amend shortly thereafter on June 27, 2023. Plaintiffs' case should not fall on the basis of a lack of diligence where that potential party was inexplicably not identified as required and was identified during depositions that took place in a timely fashion after Plaintiffs had to work with opposing counsel to complete written discovery, all because of an unexpected summary judgment deadline.

The discovery period should have been extended to permit the discovery deposition of Caldwell with regard to summary judgment, Plaintiffs further request that it have the opportunity to amend the Complaint to join Caldwell as a party to the lawsuit. Similarly, the district court had no basis to find prejudice to Officer Malone where the claim against her is based on vicarious liability, and she had only recently admitted personally witnessing Wilmot's use of force and wholly supporting his actions. The district court fundamentally abused its discretion to hold Christensen's right to recovery against these potentially responsible parties because it lacked any reasonable basis to decide the merits of this case on the basis of its misleading

summary judgment deadline.

## IV. THE DISTRICT COURT ERRED BY GRANTING SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS FOR CONSTITUTIONAL VIOLATION PURSUANT §1983.

The standard of review for summary judgment is a *de novo* standard. *See Thiele v. Norfolk & Western Ry. Co.,* 68 F.3d 179, 181 (7th Cir.1995).

### A. There is Sufficient Evidence to Support a Finding that Wilmot Used Unreasonable Force on Christensen.

Based upon the fact that Christensen turned herself into the police voluntarily and was housed pending administrative action for an alleged parole violation, she is akin to an un-sentenced detainee, whose treatment is measured under an "objective reasonableness" standard as outlined in *Kingsley v. Hendrickson*, 576 U. S. 389 (2015).

In determining whether intentional use of force crosses the constitutional line, a court should look to such factors as: (1) the need to use force, (2) the extent of injury inflicted, (3) the relationship between the need for force and the amount of force that was used, (4) defendants reasonably believed there was a threat to the safety of staff or prisoners, (5) any efforts made by defendants to limit the amount of force used, and (6) whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm. *Id.* at 394-95. If there is evidence that force was not applied in a good faith effort to maintain or restore discipline, but maliciously and sadistically for the very purpose of causing harm, then the claim may proceed. *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986). The determination of whether the use of force is deliberate (*i.e.,* purposeful or knowing) is often a function of weighing the evidence, and drawing of legitimate inferences from the facts, which are jury functions, not those of a judge. *See Sallie v. Thiel*, 23 Fed. Appx. 586, 589 (7th Cir. 2001) (material fact question presented by conflicting evidence of officer's awareness and

intent*); Rogers v. Evans*, 792 F.2d 1052 (11th Cir. 1986) (summary judgment not ordinarily granted where motive, intent, subjective feelings, and reactions are to be searched).

In this case, rather than evaluate the relevant factors, the district court concluded that video evidence "conclusively" shows that Wilmot did not use excessive force. (R. 85, p. 14, RA. 27) (*citing Scott v. Harris*, 550 U.S. 372, 380 (2007)). Yet, in *Scott*, where plaintiff's account was "blatantly contradicted by the record," the Court expressly acknowledged that it was the *exception*, and not the rule. *Id.* at 275-76 (emphasis supplied). The Court in *Scott* explained summary judgment is not appropriate on the basis of video evidence, even if it lends support to defendants account, or even makes it "unlikely" that plaintiff's account is true. *Id.* at 276. In *Chilcutt v. Santiago*, the Seventh Circuit recently held that where a video was open to interpretation, the final interpretation must be left to the trier of fact. 2023 WL 4678583, *6 (7th Cir. 2023) (*citing United States v. Nunez*, 532 F.3d 645, 651 (7th Cir. 2008) (even when transcript of audio recording exists, jury should be instructed to "rely on its own interpretation.").

Applying this standard of evidence to the instant case, the video depiction of the altercation between Wilmot and Christensen does not conclusively eliminate a finding that Wilmot's use of force was done maliciously rather than a good faith attempt to restore order. Wilmot's use of force was more than necessary to achieve his articulated objective. Christensen was a young adult female without any violent criminal history. Any security problem posed by Christensen was non-existent or minimal, as was any threat to Wilmot. Prior to entry, Wilmot knew Christensen was locked in her cell asleep on the floor, demonstrably exhausted after having a mental breakdown. After the Styrofoam container hit Wilmot's boot, he had time to deliberate whether his action was necessary to restore discipline (as opposed to being pressed to make a split judgment), in light of the circumstances. He did not request Christensen to get off

the mattress. Rather, he initiated physical contact by forcefully pulling the mattress up with her still on it. The district court acknowledged that "Wilmot pulled the mattress out from under Christensen while she was still lying partly on it" (Id.), but ignored how that mechanism thrust Christensen into Wilmot against her will, claiming such account was "flatly contradicted by the video evidence" like *Scott*. (Id. at p. 14). But, a jury of Christensen's peers may not similarly characterize Wilmot's use of force as benign and done in good faith.

This video in this case falls squarely into the "inconclusive" category, given the portion relied on by the district court did not depict all the defendant's conduct or full context. Further, unlike *Scott*, the video does not present a "blatant contradiction" to negate Christensen's version of events. The interaction happened very fast. Still, Wilmot action of forcing Christensen into him with force based on throwing Styrofoam supports an inference of malicious intent. Further, Wilmot's action of vindictively exaggerating the incident to justify placement of Christensen into prolonged solitary confinement, inevitably prevent parole, and subject her to punishment for an additional crime supports an inference of malicious intent. Wilmot knew Christensen was suffering from an acute mental health crises and suicidality, but continued to enforce solitary conditions. Wilmot coerced Christensen into waiving due process for the punishment by promising to put her "back by people" (implying general population) once her COVID test came back negative. If Christensen openly admitted she was worried about ten (10) days in solitary confinement away from people, there is a reasonable inference Wilmot knew thirty (30) days would be devastating if he broke the promise not to leave her in extreme solitary isolation in her vulnerable condition. In sum, there is ample circumstantial evidence of malicious intent that a reasonable jury could find motivated Wilmot's use of unreasonable force in the first instance for the very purpose of causing harm to Christensen, which should be decided by a jury.

Tellingly, the district court erred by making several factual findings reserved for the jury to support its interpretation of the video. First, the district court found that Wilmot stood in the open doorway, "directly in Christensen's line of site," which is not conclusively shown in the video (R. 85, p. 4, RA. 26). Second, the district court concluded the Styrofoam container that Christensen threw had "food in it" when Christensen threw it in his direction; yet, the video starkly contradicts that any food was in the container, and there is an absence of other corroborating evidence. (R. 59-20). Third, the district court also relied on Christensen's admission to Wilmot that "I barely shoved you"[4] while she was in the restraint chair. (R. 85 at p. 5, RA. 28). Christensen's inarticulate description of the event cannot serve to conclusively re-write the event itself, particularly where it is captured by video. A "shove" would refer to a forceful push or thrust, which is a serious assault that carries a threat of physical harm, which does not fairly characterize Christensen's placement of her hands minimal force to move away from Wilmot. Rather, Wilmot is the one who effectuated unwarranted contact with Christensen by pulling up on her mattress with force as he did. Finally, the district court found that "Wilmot wasn't the aggressor, Christensen was." (R.85, at p. 14, RA. 37). On the other hand, the trial court ignored Christensen's statement that she did not push Wilmot but had been in traumatic situations and was "trying to get away."[5] (Id. at p.5, n. 3, RA. 28). Further, the trial court ignored other snapshots of the video supporting Christensen's version of the events. (R. 58, p.8-

[4] The district court did not explain why this out-of-court statement from Christensen was not hearsay, whereas her out-of-court statement of what happened in the medical segregation cell was excluded as hearsay.

[5] The trial court abused its discretion in ruling Christensen's statement was hearsay, given that through her estate, she is a legal party to this action, such that her statements are an admission" that is therefore admissible under Fed. R. Evid. 801(d)(2)(A) *See Estate of Shafer v. Commissioner,* 749 F.2d 1216, 1220 (6th Cir.1984) (stating that a decedent, "through his estate, is a party to [an] action," so that the decedent's statements "are a classic example of an admission").

9, SA. 6). Notwithstanding a snapshot of video that could suggest to the contrary, the characterization of the video evidence is clearly for the jury.

### B. ACH/Vilas County Denied Christensen Medical Treatment for Obvious Symptoms of Mental Illness, or Alternatively, Supplied Grossly Inadequate Treatment.

A state actor violates an inmate's rights under the Eighth Amendment when he or she exhibits deliberate indifference to the inmate's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Although most challenges to prison medical treatment have focused on the alleged deficiencies of medical treatment for physical ills, courts have rightly seen no reason why psychological or psychiatric care should not be held to the same standard. *Sanville v. McCaughtry*, 266 F.3d 724, 733-34 (7th Cir., 2001) (mental illness may constitute such a need if failure to treat the condition poses a threat to an inmate's health or safety); *Rogers*, 792 F.2d at 1058 (11 Cir. 1986) (the failure to provide basic psychiatric and mental health care states a claim of deliberate indifference to the serious medical needs of prisoners). Indeed, it is now common knowledge that serious mental or emotional disturbances result in pain and suffering just as real as the pain from the failure to treat serious physical ailments. Thus, the "deliberate indifference" standard of *Estelle* requires medical personnel qualified to diagnose and treat such mental illnesses or disturbances, and when such treatment is prevented such that bad consequences happen, the system of care does not meet the constitutional requirements set forth by *Estelle*.

In this case, Christensen's mental illness clearly manifested itself in the form of bizarre and self-destructive behavior in the medical segregation quarantine and the restraint chair, establishing a serious medical need. The jail officers who interacted with Christensen prior to being placed on suicide watch both noted that Christensen was mentally disturbed and in need of medical attention. Christensen was also noted to suffer from bipolarism, take medication, and

have a history of suicide attempts. Thus, Christensen clearly had a constitutional right to medical treatment to address her obvious medical need, which the defendants knew remained unaddressed.

Circumstances that permit a jury to find deliberate indifference include a complete denial of medical care, delay of care, substantial departure from accepted professional practice, ignoring an obvious risk, and refusing to provide care because of cost. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (collecting cases). As a practical matter, this can be evidenced by repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff or systemic deficiencies in staffing or procedures effectively deny inmates access to adequate medical care. *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983). The courts distinguish between a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment. *See e.g., Wallace v. Baldwin*, 895 F.3d 481, 484 (7th Cir. 2018). Each theory is separately addressed below.

> a. *A Reasonable Jury Could Find that Ziemba's "Support and Encouragement" Instead of Medical Care Was Deliberately Indifferent to Christensen's Symptoms of Mental Illness.*

Medical providers "may violate the Eighth Amendment if they prescribe a course of treatment without exercising medical judgment." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662-63 (7th Cir. 2016); *See Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (a doctor's decision to refer a prisoner to a specialist must involve the exercise of medical discretion). In *Mombourquette*, the court found there was an issue of fact whether the nurse was qualified to determine whether the decedent was at risk for harming herself, and noted the cases cited by defendants involved decisions of psychiatrists, each of whom had conducted mental health examinations of the inmate. 469 F.Supp.2d at 639-40. Similarly, in *Perez*, the Sixth Court

ruled a question of fact remained whether a social worker knowingly disregarded the risk by moving the decedent to single cell housing without first requesting a medical judgment from a psychiatrist as to whether the placement was appropriate. *Perez v. Oakland County*, 466 F.3d 416, 425 (6th Cir., 2006). Further, the Third Circuit held that an inmate with a serious mental illness must receive a meaningful medical examination before being placed in prolonged solitary confinement. *See Palakovic*, 854 F.3d at 226, 228-29 (there is inherently inadequate mental health care of people with a serious mental illness when they are placed in solitary confinement).

In the case at hand, a reasonable jury could find that Christensen was effectively denied any medical evaluation of her serious mental illness and suicidality by Vilas County and ACH. The district court seems to have acknowledged that Christensen's reported history of bipolarism, depression, and chronic and acute suicidality, presented an "objectively serious medical condition" but does not acknowledge her corresponding constitutional right to medical evaluation, diagnosis and treatment for her condition. (R. 85, p. 12, RA. 35). Christensen said she had voices in her head telling her to kill herself <u>for a while</u>; she couldn't be <u>alone in the cell anymore with the voices</u>; and they shouldn't have followed her into the jail. Both Wilmot and Malone testified they thought that Christensen should be seen by a doctor based on her obvious symptoms of mental illness or drug withdrawals. The videos of Christensen in medical segregation and the restraint chair to follow paints a haunting picture of someone in dire need of medical treatment, particularly if placed back into prolonged solitary confinement where she was alone with the voices that made it unbearable. Yet, Ziemba testified she could not provide a formal medical diagnosis and did not develop a treatment plan for Christensen. Ziemba testified she had no ability to refer Christensen for medical treatment for mental illness, except upon release from the jail. Instead, Ziemba would offer "support and encouragement." A reasonable

jury could conclude, as did Dr. Carda, that Ziemba's interaction with Christensen did not provide any evidence-based medical care to address Christensen's symptoms of mental illness or suicidality.

The district court misconstrues Plaintiffs' argument to be that "the only proper response was to refer Christensen to a psychiatrist." (Id. at p. 19, RA. 42). Again, Plaintiffs' argument is Christensen had a right to see someone with sufficient training to provide a medical diagnosis and treatment plan to address symptoms of obvious mental illness and suicidality. This person could be a fully licensed and trained clinical social worker, but clearly did not include Ziemba. In any event, such evaluation must involve medical judgment as to a diagnosis and treatment plan, to include whether medication is indicated, and not restrict access to such care as necessary. Ziemba's testimony demonstrates that she did not believe herself capable of providing medical care, and did not believe there was an avenue to refer Christensen for such care within the jail, which establishes *prima facie* evidence of a constitutional violation in that regard. A reasonable jury must evaluate the credibility of Ziemba's self-serving testimony that she did not believe the law allowed her to do so.

> ### b. A Reasonable Jury Could Find that Ziemba's Care Was So Woefully Inadequate it Amounted to No Medical Care.

In some cases, the medical attention rendered by correctional facilities may be so woefully inadequate as to amount to an essential denial of medical care. *See Reed v. McBride,* 178 F.3d 849, 854 (7th Cir.1999). A trier of fact can conclude that "one who provides grossly inadequate psychiatric care to a prison inmate is deliberately indifferent to the inmate's needs." *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990). Further, a doctor's choice to resort to an "easier and less efficacious treatment" without exercising professional judgment can constitute deliberate indifference. *Petties*, 836 F.3d at 730.

In *Greason*, the decedent's initial visit with the psychiatrist lasted only a few minutes, during which he discontinued medication without reviewing the clinical file or conducting a mental status examination to learn of the decedent's extensive history of mental illness, which indicated the decedent would be a suicide risk without medication. 891 F.2d at 835. The court noted expert opinion in the record that the psychiatrist handled the case in a grossly incompetent manner, and despite expert testimony that the psychiatrist was merely negligent, the court held the issue with regard to the constitutional adequacy of medical care had to be resolved by the jury. *Id.*; *see Rogers*, 792 F.2d at 1060 (whether doctor's treatment was grossly incompetent placed at issue by psychiatric expert affidavit). In *Mombourquette,* the defendant argued that the nurse exercised "medical judgment" that the plaintiff would not commit suicide, without preparing a written report or otherwise documenting the medical basis for her decision to ignore the psychiatrist instructions to place the inmate on suicide watch, beyond one line in the staff log stating: "plaintiff denies ideas of self-harm or suicidal thoughts—continue to observe closely." 469 F.Supp.2d at 640. Thus, the district court found a reasonable jury could find the nurse's medical judgment, if any, was a substantial departure from professional judgment. *Id.* at 641. The court further noted that, in cases where the inmate already demonstrated a tendency to harm herself, courts have uniformly held that a genuine dispute remains as to whether defendants were aware of substantial risk of harm, even where the inmate denies suicide. *Id.* at 644.

Under this standard, there is *prima facie* evidence that a reasonable jury could find Ziemba failed to provide minimally adequate medical care to Christensen. First, similar to *Geason*, Ziemba met with Christensen for a brief period of approximately fifteen minutes and released her based on a canned self-report all her symptoms resolved. Second, Ziemba failed to conduct any detailed analysis of Christensen's suicide risk evaluation. In fact, from the timing of

Christensen's release from suicide watch, a reasonable inference could be made that Ziemba released Christensen out of convenience to make room for another suicidal inmate. Like *Greason* and *Mombourquette*, Ziemba prepared no detailed report or otherwise document the medical basis for her decision to release Christensen from suicide watch and into further prolonged confinement. Ziemba released Christensen from suicide watch without making any detailed analysis of her ongoing suicide risk or relevant clinical and historical factors related to hearing voices telling Christensen to kill herself.[6] Despite Ziemba's lack of ability to render a formal diagnosis, she disagreed that Christensen was bipolar or had a serious mental health need, despite her communicated history of issues with depression, bipolarism, and chronic suicide attempts. Ziemba also made no consideration of how Christensen would respond to ongoing prolonged solitary confinement in her vulnerable condition.

Third, Ziemba failed to provide any formal medical diagnosis or treatment plan to mitigate Christensen's suicide risk or provide treatment for her endorsed mental health symptoms and the origin of her chronic and acute suicidality. Providing a non-medical "provisional diagnosis" and dispensing "support and encouragement" is precisely the type of "easier and less efficacious treatment" without exercising professional judgment that constitutes deliberate indifference. *See Petties*, 836 F.3d at 730. Indeed, Ziemba failed to make any referral for such a diagnosis and follow up treatment and testified that there was no ability to do so after she was released from the jail. Finally, unlike *Greason*, there is no contrary expert testimony to suggest that Ziemba was merely negligent. Accordingly, as in *Mombourquette* and *Greason*, the

---

[6] The district court disregarded the Carda Declaration, acknowledging Carda's opinion that Ziemba failed to conduct an "adequate" suicide risk evaluation, but claimed Carda did not say *why* it was inadequate. (R.85, p. 21, n. 7, RA 43). Yet, the Carda Declaration plainly states that Ziemba released Christensen from suicide watch without making any reasoned assessment or evaluation of her suicide risk, without providing any avenue of referral to a psychiatrist. (R.64-1, ¶¶24-25, RA 14).

issue of whether Ziemba exercised medical judgment in her actions with regard to Christensen must be resolved by the jury.

The district court distinguished this case from *Greason* on grounds that Christensen had no records indicating that she was ever diagnosed with a mental impairment or hospitalized for psychiatric treatment, or prescribed any psychotropic or other medications for a mental condition. (R. 85 at p. 19, RA. 41). Yet, the Vilas County Jail's own records from Christensen's prior stay was indicate she was known to suffer from depression and/or bipolarism, had taken medications to address her symptoms in that regard, and had attempted suicide many times. Moreover, there can be no question that Christensen showed obvious symptoms of mental illness in need of medical treatment in the medical segregation cell and restraint chair, which Wilmot and Malone acknowledged. Indeed, if Christensen's obvious signs of mental illness lacked a formal medical diagnosis and treatment plan, to potentially include medication, there should be more urgency to do so in order to get her symptoms and concomitant suffering under control. A jury could find a pattern of deliberate indifferent conduct by the prison medical staff based on the unexplained failure to treat Christensen for withdrawal before placing her in solitary confinement for quarantine, and initial medical examination that took place a day past the required deadline.

To rule in favor of ACH and Ziemba on summary judgment, the district court made several findings of fact that should have been reserved for the jury. First, the district court argued that it is "undisputed" that Ziemba was qualified under state law to provide clinical social work under the supervision of a psychologist like Caldwell, without further analysis of whether she actually did so in this case. (R. 85, p. 7, 19, RA 29, 41). The district court accepted a meaning of "supervision" in its most abstract sense and ignored evidence upon which a jury could find Caldwell's training and "supervision" was completely illusory where Caldwell was never present

to observe any of Ziemba's clinical work at the jail in real time nor had any documented communications with Ziemba in that regard. Further, the district court ignored that Ziemba lacked a current licensure with clinical specialty in the state from the appropriate state licensing board, as required by Vilas County Jail's own job application for her position. Upon this evidence, a reasonable jury could infer that Ziemba was unqualified to provide competent medical treatment to Christensen at the time, just as Carda did. The district court erred by weighing these disputed facts on the summary judgment record.

        *c.  A Reasonable Jury Could Find Supervisory Liability on the Part of Vilas County's Wilmot and ACH's Melissa Caldwell.*

Supervisory liability under Section 1983 cannot attach unless there is a showing that the supervisor violated the Constitution through their own conduct; namely, that Christensen's injury occurred at the supervisor's direction or with her knowledge and consent. *See Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 619 (7th Cir. 2022). In this instance, Officer Weiss admittedly viewed the video of Officer Wilmot's unreasonable use of force and punishment of Christensen in solitary confinement, and did nothing to intervene, and is thus directly complicit in Wilmot's actions. Similarly, Caldwell would be directly implicated through her personal involvement in the placement, training and supervision of Ziemba's care of Christensen. Again, a reasonable jury could find that Caldwell resorted to "easier and less efficacious treatment" without medical judgment by utilizing an unlicensed clinical social worker to evaluate suicidal inmates and provide care for any symptoms of mental illness.

        *d.  A Reasonable Jury Could Find Monell Liability on the Part of Vilas County/ACH for Its Unconstitutional Policy of Medical Care for Mental Illness.*

When execution of a government's policy or custom inflicts constitutional injury, then the government as an entity is responsible under Section 1983. *Woodward v. Correctional Med.*

*Services of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004). The Supreme Court has expressly acknowledged that evidence of a single violation of federal rights can trigger municipal liability if the violation was a "highly predictable consequence" of the municipality's failure to act. *Id.* at 929. Likewise, a corporate entity violates an inmate's constitutional rights "if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Id.* Inaction, too, can support *Monell* liability if it reflects "a conscious decision not to take action." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017) (en banc).

For example, in *Greason*, the court held that there was sufficient evidence to overcome summary judgment where the clinical director knew about the severe lack of staff members capable of providing psychiatric care to the inmates, complaints, and a lack of action with regard to the same. *Id.* at 838. In *Belcher v. Lopinto*, a district court held sufficient evidence to raise a factual question where the jail's policies and procedures that permitted: (1) a social worker to release the decedent from suicide watch without conducting any psychological or diagnostic assessment, (2) relying solely on the decedent's own account of his mental state, and (3) without developing a plan after his discharge. 492 F.Supp.3d 636, 644, 656 (E.D. Louisiana 2020).

Under this standard, despite curtailed discovery and limited record, there is evidence from which a reasonable jury could find Vilas County and ACH liable for deliberately disregarding Christensen's right to medical care on the basis of their policy of staffing, training and supervision. ACH, through Caldwell's staffing, training and supervision of Ziemba (who claims to have followed such instructions), set the policy for mental health care at Vilas County Jail and directly contributed to Christensen's constitutional injury. Why was Ziemba hired to provide medical care for mentally ill and suicidal inmates without the training-based licensure

required to perform her role according to Vilas County's own job requirements? Where did Ziemba learn that inmates could only receive a referral for follow up care upon release from the jail regardless of whether they had obvious signs of mental illness based on a legal issue? Plaintiffs must be permitted full discovery on such issues on remand.

For Vilas County's part, they completely washed their hands of any responsibility for medical care for mental illness, or the placement of mentally ill inmates into prolonged solitary confinement, by virtue of hiring ACH. The position of willful ignorance related to ACH's compliance with their jail policies is itself a policy choice that a reasonable jury could find offensive to their constitutional mandate. Further, ACH's policy directed that Vilas County officers print the name of ACH's Physician's Assistant Scott on the suicide release form, despite that he had never spoken to Christensen or reviewed her file. Christensen's constitutional violation was a direct result of the policy implemented by ACH and Vilas County. Since full discovery was not permitted, Vilas County and ACH's potential financial incentives in staffing and training Ziemba as they did is not in the record, but it should be explored on remand.

### C. Wilmot's Unreasonable Use of Force Resulting in Christensen's Prolonged Solitary Confinement and ACH/Vilas County's Lack of Medical Treatment Were Each a Cause of Christensen's Mental Anguish and Suicide.

If the ultimate harm was a natural, probable, and foreseeable consequence of the act or omission, the original wrongdoer may still be held liable even though independent agencies intervened between the action and the ultimate result. *Milwaukee & St. P.R. Co. v. Kellogg*, 94 U.S. 469, 474-75 (1876). Questions concerning foreseeability and proximate cause particularly lend themselves to a decision by a jury. *Id.*; *Gracyalny v. Westinghouse Elec. Corp.*, 723 F.2d

1311, 1316, 1323 (7th Cir. 1983).

Elementary principles of legal causation are as applicable to constitutional torts as to common law torts. *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988); *Pyka v. Village of Orland Park*, 906 F. Supp. 1196, 1231–32 (N.D. Ill. 1995) (noting that in addition to reasonable force, if the disputed evidence of striking and slapping conduct, although tenuous evidence, may also—if it is found to violate the Fourth Amendment—provide a basis for a proximate cause finding related to suicide and should be presented to the jury).

In this case, Wilmot's unreasonable use of force that caused Christensen into prolonged solitary confinement without due process was a cause of injury to her. In turn, Weiss had full knowledge of the incident and deliberately disregarded his supervisory obligations in terms of review of use of force and imposition of prolonged solitary confinement under the circumstances. Further, Ziemba's lack of any medical intervention for Christensen's mental illness invariably injured Christensen's well-being and physical safety, particularly being kept in solitary conditions for an extended period. A reasonable jury could find that, had Christensen had the opportunity to take medication for her depression and suicidal thoughts, the suicide would not have taken place. On the other hand, Carda opined that there was a high probability that exposing Christensen to the same conditions of isolation, without any clinical evaluation or medical treatment, would carry an elevated risk of harm to her mental wellbeing, to potentially include the subsequent decision to end her life. Further, without such medical care, the suffering of repeated acute episodes of mental illness can be predicted as likely, particularly when an inmate is subjected to solitary confinement. Indeed, there is plenty of medical and psychological literature concerning the ill effects of solitary confinement, particularly on mentally ill inmates. *Scarver v. Litscher*, 434 F.3d 972, 975 (7th Cir. 2006); *Rasho v. Walker*, 2022 WL 1801002, *5-6

(C.D.Ill 2022) (noting "extensive comments from the Seventh Circuit confirm that persistent isolation can be excruciating, particularly for those with severe mental illness"); *See Madrid v. Gomez*, 889 F. Supp. 1146, 1264-65 (N.D. Cal. 1995) (segregating people with serious mental illness is "the mental equivalent of putting an asthmatic in a place with little air to breathe."). The district court characterized solitary confinement as merely "unhealthy" (R.85, p. 16, RA. 39), akin to eating unhealthy food, when it is clearly more than that for someone like Christensen who is suffering from mental illness. A reasonable jury could find it foreseeable that keeping Christensen in prolonged solitary confinement as a result of Wilmot's unreasonable use of force, without medical intervention for her mental health, was a cause of unnecessary pain and suffering, culminating in her suicide. *See Taylor v. Wausau Underwriters Ins. Co.*, 423 F.Supp.2d 882 (E.D. Wis., 2006) (the law assumes that, absent serious mental illness or other form of incapacity, a person has free will and is therefore responsible for their own intentional acts).

The district court assumed that expert medical evidence was required to show Christensen would be negatively impacted by prolonged solitary confinement, and that Plaintiffs failed to "adduce any reliable medical evidence, expert or otherwise, to support their lay contention that Christensen's mental breakdown in the med seg unit was <u>caused</u> by her confinement (as opposed to drug withdrawal for example)." (R. 85, p.17, RA. 40) (emphasis in original). Yet, Malone and Wilmot knew that Christensen was having a hard time being alone, which is why Wilmot promised to put her back by people to incentivize her to waive due process review of his conduct that led to her discipline. The obvious implication is that subjecting Christensen to further unwarranted time in solitary confinement would be expected to have a substantial negative impact on her mental condition. Again, the trial court ignored any evidence

supplied by the Carda Declaration to that effect to reach its holding. (R. 64-1, p. 3-7, RA. 12-16)

The district court plainly ignored the legal maxim that all evidence must be construed in favor of

the non-moving party where grounds to support a reasonable inference exists, which requires

reversal.

### D. A Reasonable Jury Could Find Defendants Were Deliberately Indifferent to a Substantial Risk of Harm to Christensen, Including Suicide.

"A condition is objectively serious if failure to treat it could result in further significant

injury or unnecessary and wanton infliction of pain." *Reed McBride*, 178 F.3d 849, 852 (7th Cir.

1999); *Hall v. Ryan*, 957 F.2d 402, 406 (7th Cir. 1992) (confirming a "prisoner's right to be

protected from self-destructive tendencies"). A constitutional violation occurs if defendants were

subjectively aware of a substantial risk of serious harm and were deliberately indifferent to the

risk. *Farmer v. Brennan,* 511 U.S. 825, 844, 847 (1994). Courts have noted, however, this test

does not resolve all questions regarding the meaning of "deliberate indifference." *See*

*Mombourquette*, 469 F.Supp.2d at 624 (standard denotes more than a "mere possibility," less

than a certainty, and one that society would not tolerate… [and] it is reasonable to expect

officials to be more sensitive to risk of death than to a risk of unsanitary conditions").

> a. *A Reasonable Jury Could Find Defendants Were Aware of a Substantial Risk of Harm of Placing Christensen in Prolonged Solitary Confinement Under the Circumstances.*

"Actual knowledge" can be proven with direct evidence, but it need not be; a trier of fact

can infer such knowledge from the obviousness of the risk. *Estate of Cole by Pardue v. Fromm*,

94 F.3d 254, 260 (7th Cir. 1996). Further, circumstantial evidence can be used to establish

subjective awareness and deliberate indifference. *Thomas v. Cook County Sheriff's Dept.*, 588

F.3d 445, 452 (7th Cir. 2009). What the defendants knew is not an issue for this Court; rather,

weighing such evidence is the sole province of the jury. *Farmer*, 511 U.S. at 842.

Courts have found that officials should be aware of a substantial risk of harm to removing an inmate from suicide watch into prolonged solitary confinement despite obvious signs of mental illness and suicidality. In *Palakovic v. Wetzel*, the decedent had attempted suicide on prior occasions and told prison officials so; and had multiple, serious mental illnesses but was placed in solitary confinement, carrying a higher risk. 854 F.3d at 231. The court denied summary judgment, noting that "each case will present unique circumstances and should be considered on its own facts." *Id.*

In *Perez v. Oakland County*, the decedent threatened and attempted suicide on several occasions in the past, had been placed on behavior and suicide watches during other periods of incarceration at the same jail, and attempted suicide in his cell a month or so before his successful suicide attempt. 466 F.3d at 424-25. The court held that a question of fact remained as to whether there was a strong likelihood of a suicide attempt, despite a licensed psychiatrist who said there was no indication of suicidal intention during his final evaluation, supported by his counseling notes. *Id.* at 425.

In *Belcher v. Lopinto*, the decedent's denial of suicidal ideations did not result in summary judgment on the basis of: (1) an actual suicide attempt, (2) experiencing symptoms of withdrawal, and (3) less than two weeks prior, the premature discharge of an inmate that resulted in a successful suicide. 2021 WL 765378 at *2 (E.D. Louisiana, 2021). Based on the circumstances, the court held a factfinder could "easily" find that the social worker was deliberately indifferent by ordering the decedent's discharge from suicide watch. *Id.*

On the other hand, in *Matos*, summary judgment was appropriate where the decedent never reported feeling suicidal or depressed beyond his control to suggest suicidal or delusional

tendencies or that he needed to be placed on crisis or suicide watch. *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003); *see also Minix v. Canarecci, Jr.*, 597 F.3d 824 (7th Cir. 2010) (granting summary judgment where decedent placed on suicide watch only because of a missing razor, without any behavior unambiguously evidencing an elevated risk for suicide).

Applying this standard to the facts of this case, the district court erred when it granted summary judgment on Plaintiffs' §1983 claim, instead of deferring to the jury to resolve its unique circumstances and facts. The district court's decision did not analyze the legal standard; rather, it characterized Plaintiffs' position as "conceding" that they can't prevail in showing that any of the Vilas County or ACH defendants were aware of a substantial risk that Christensen would commit suicide, despite that assumption obviously underlies their case theory set forth in the record. (R. 85, p. 12, 17, RA 34, 49). The court went so far to say that Plaintiffs "'expressly disavowed' that they are contending any defendants consciously disregarded the specific risk that Christensen would commit suicide."[7] (Id.).

While Plaintiffs would acknowledge Christensen denied suicidal thoughts and made no known actions toward suicide *immediately* prior to her death, there is *prima facie* evidence that defendants still knew that Christensen presented a substantial risk of harm to herself in prolonged confinement without any precautions, including: (1) history of mental illness and chronic suicide attempts documented in the jail records; (2) she had previously been on suicide watch at Vilas County; (3) expressly threatening/promising to Wilmot that she would complete the suicidal act; (4) the severity of her mental breakdown on the video and restraint chair; (5) being housed in prolonged solitary confinement without medical evaluation for mental illness or withdrawal symptoms, (6) Wilmot's referred criminal complaint for new charges of felony battery; (8) cut

---

[7] The district court twice failed to cite the record on this point to know what it was referencing. (Id.).

marks on Christensen's wrists from previous self-harming behavior, and (8) a lack of intervening force to change the outcome from Christensen's prior suicidal reaction to prolonged solitary confinement. A reasonable jury could find that defendants were substantially aware Christensen remained on a knife's edge after being placed back into prolonged solitary confinement under the circumstances. At the very least, there is evidence that defendants knew that Christensen was likely to suffer wanton mental pain and suffering in prolonged solitary confinement, as she did previously, which caused harm even if it did not culminate in suicide, although defendants are liable for all foreseeable consequences for their constitutional misconduct. *See Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1190 (7th Cir. 1985). Weighing society's collective common sense in this regard requires a jury trial.

### b. A Reasonable Jury Could Find Defendants Deliberately Indifferent to Christensen's Prolonged Solitary Confinement Without Medical Treatment or Other Precautions Against Self Harm.

With circumstantial evidence of sufficient knowledge of an obvious risk, the failure to take simple steps to prevent that inmate from committing suicide can amount to deliberate indifference. *See Greason*, 891 F.2d at 835 (placing an inmate to be alone in a cell where he could not be continuously observed and provide well known tools that can be used for self-harm); *Cavalieri v. Shepard*, 321 F.3d 616, 621 (7th Cir. 2003) (recognizing procedures for dealing with prisoners who display suicidal tendencies, such as removing items that could be used as a suicide weapon, like sheets or a sturdy telephone cord, or not leaving those prisoners unattended); *Perez*, 466 F.3d at 425 (placing someone into a single cell without medical judgment from a jail psychiatrist whether the placement was appropriate could show deliberate indifference); *Estate of Cills v. Kaftan*, 105 F.Supp.2d 391, 402-03 (D. New Jersey, 2000) (absence of qualified mental health personnel a serious deficiency in the suicide policy that

created a serious risk that injury or death would occur).

Here, a reasonable jury could find defendants Wilmot, Weiss, and Ziemba deliberately indifferent to a substantial risk of Christensen's suicide based on a reasonable inference the substantial risk was itself obvious, given the unique factors of a chronic history of suicide attempts, history of mental illness, threat and promise to commit the act, the lack of meaningful evaluation for release and/or medical intervention, and prolonged solitary confinement. Given their knowledge of Christensen's obvious vulnerability to suicide, defendants could have easily taken minimal steps such as increased monitoring, initiation of medical referral to permit a diagnosis and treatment plan for her mental illness and/or withdrawals contributing to her vulnerability, removing the most obvious means for suicide until Christensen is evaluated for mental illness and suitability for ongoing solitary confinement, or at least put Christensen back "by people" as she was promised. Instead of taking any precautions, Vilas County and ACH merely paid lip service to address Christensen's condition by inserting the signature of ACH's Physician's Assistant, Scott, on the suicide release form, despite never having any review of her file. Critically, aside from Christensen's unexplained self-reporting, Defendants had no reason to believe the voices in her head constantly commanding her to kill herself magically disappeared, such that it was safe for her to remain in prolonged solitary confinement that she had just expressed pushed her over the edge. It cannot be said as a matter of law that her risk of suicide was a "mere possibility," such that a lay person would not recognize to take any precautions. To the contrary, there is evidence under these unique facts that which a reasonable jury could find the defendants recognized a "strong likelihood" that Christensen would again inflict self-harm, which was deliberately disregarded by their actions of indifference to any preventative measures.

If Christensen's circumstances were insufficient to allege an obvious particular vulnerability to suicide, it is difficult to imagine how any plaintiff could succeed in doing so.

## CONCLUSION

Plaintiffs-appellants respectfully ask this Court to: (1) reverse the district court's Order denying additional discovery and remand the case for further proceedings as to all ACH employees; (2) reverse the district court's Order denying leave to file the Carda Declaration in opposition to summary judgment; (3) reverse the district court's Order denying leave to file an Amended Complaint against Vilas County's Malone and ACH's Caldwell; and further (4) grant of summary judgment on the constitutional violation claims, and remand the case for further proceedings on the federal and state law claims.

MCCOY LEAVITT LASKEY LLC

Dated: March 18, 2024

By: /s/ Michael D. Aiken
Michael D. Aiken
N19 W24200 Riverwood Drive, Ste. 125
Waukesha, WI 53188
Phone: (262) 522-7000
Fax: (262) 522-7020
maiken@mlllaw.com


## CERTIFICATE OF COMPLIANCE WITH CIR. R. 30(a)&(b)

I hereby certify that all of the materials required by parts (a) and (b) of Circuit Rule 30 have been included.

MCCOY LEAVITT LASKEY LLC

Dated: March 18, 2024

By: /s/ Michael D. Aiken
Michael D. Aiken
N19 W24200 Riverwood Drive, Ste. 125
Waukesha, WI 53188
Phone: (262) 522-7000
Fax: (262) 522-7020
maiken@mlllaw.com

**CERTIFICATE OF COMPLIANCE WITH TYPE REQUIREMENTS**

This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains [13,876] words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point New Times Roman Font.

MCCOY LEAVITT LASKEY LLC

Dated: March 18, 2024

By: /s/ Michael D. Aiken
Michael D. Aiken
N19 W24200 Riverwood Drive, Ste. 125
Waukesha, WI 53188
Phone: (262) 522-7000
Fax: (262) 522-7020
maiken@mlllaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Brief of Plaintiffs-Appellants, the annexed Required Appendix, and the Separate Appendix have been filed in the Office of the Clerk for the United States Court of Appeals for the Seventh Circuit, in electronic form on March 18, 2024, and also by delivering same to the Clerk of the Seventh Circuit Court of Appeals. I further certify that counsel for all parties are participants in this Court's electronic filing system and that paper copies of the brief and appendices have been served on counsel for Defendants, by mail by depositing same in the United States Mail.

MCCOY LEAVITT LASKEY LLC

Dated: March 18, 2024

By: /s/ Michael D. Aiken
Michael D. Aiken
N19 W24200 Riverwood Drive, Ste. 125
Waukesha, WI 53188
Phone: (262) 522-7000
Fax: (262) 522-7020
maiken@mlllaw.com

## TABLE OF CONTENTS – REQUIRED APPENDIX

1. Text Only Order Granting Joint Motion to Extend Dispositive
   Deadline (R. 32, entered April 18, 2023).....................................................RA 1

2. Text Only Order from Scheduling Conference
   (R. 33, entered May 18, 2023) ..................................................................RA 2

3. Text Only Order on Summ. J. Briefing Deadline
   (R. 34, entered May 18, 2023) ..................................................................RA 3

4. Text Only Order (R.48, entered June 7, 2023) ..........................................RA 4

5. Order Denying Motion for Extension of Time for Additional
   Discovery (R. 61, entered June 12, 2023)..................................................RA 5

6. Text Only Order for Leave to File Untimely Carda Declaration
   (R. 65, entered June 15, 2023) ..................................................................RA 9

7. Declaration of Amber Carda, Ps.D (R.64-1, p.1-8) ..................................RA 10

8. Text Only Order Denying Motion for Reconsideration of Motion
   for Leave to File Carda Declaration (R. 72, entered June 20, 2023) ........RA 17

9. Order Denying Motion for Leave to File 2nd Amended Complaint
   (R. 83, entered June 29, 2023 ...................................................................RA 18

10. Order Granting Defendants' Motion for Summary Judgment
    (R. 85, entered December 7, 2023)............................................................RA 23

11. Judgment Dismissing Federal Claims With Prejudice and State
    Claims Without Prejudice (R. 86, entered December 7, 2023) .................RA 48

**U.S. District Court**
**Western District of Wisconsin (Madison)**
**CIVIL DOCKET FOR CASE #: 3:22-cv-00253-jdp**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/18/2023 | 32 | ** TEXT ONLY ORDER ** <br> The parties jointly move to extend the dispositive motion deadline to May 19, 2023, Dkt. 31 , on the ground that the depositions for the defendants are not scheduled until late April and early May. There is little extra time in the schedule, and the parties provide no reason why they were unable to schedule the depositions sooner, which ordinarily would require denial of the motion. But this case is scheduled for trial on the same date as what is likely to be a long and complicated criminal trial, so it is likely that the case will have to be rescheduled regardless. So the motion for an extension of time is GRANTED, and the schedule is STRUCK. The clerk of court is directed to schedule a telephone conference with the magistrate judge to set a new trial date and related deadlines. Signed by District Judge James D. Peterson on 4/18/2023. (rks) (Entered: 04/18/2023) |

| Date Filed | # | Docket Text |
|---|---|---|
| 05/18/2023 | 33 | **\*\* TEXT ONLY ORDER \*\*** At a May 18, 2023 telephonic scheduling conference, counsel for both sets of defendants announced that they interpreted the court's April 18, 2023 text-only order (dkt. 32 ) as having struck the ENTIRE schedule, including the May 19, 2023 dispositive motion deadline that they had asked for in their motion (dkt. 31 ) that had prompted the court's order in the first place. The magistrate judge expressed incredulity that Judge Peterson's order was reasonably susceptible to such an interpretation, but under the circumstances, deemed it pointless to set a new trial date without obtaining clarification from the issuing judge. No summary judgment motions are coming in on May 19, 2023 because neither set of defendants has prepared one. What happens next depends on how the presiding judge wishes to proceed. The court will get back to the parties soon. Signed by Magistrate Judge Stephen L. Crocker on 5/18/2023. (rks) (Entered: 05/18/2023) |

| Date Filed | # | Docket Text |
|---|---|---|
| 05/18/2023 | 34 | **\*\* TEXT ONLY ORDER \*\*** The summary judgment deadline is May 19, 2023, as the parties requested in Dkt. 31. The court will not extend the deadline further. If the parties do not file motions for summary judgment by the deadline, the court will deem the parties to have forfeited the opportunity to file dispositive motions. Judge Crocker will hold another scheduling conference to set the trial date and the related pre-trial deadlines. Signed by District Judge James D. Peterson on 5/18/2023. (jcf) (Entered: 05/18/2023) |

| Date Filed | # | Docket Text |
|---|---|---|
| 06/07/2023 | 48 | **\*\* TEXT ONLY ORDER \*\***<br>At a June 7, 2023 telephonic conference, the court reset the schedule: the parties will decide when and how to disclose expert witnesses. Discovery ends February 23, 2024, the same day that ex parte settlement letters are due to the Clerk of Court. Submissions for the final pretrial conference are due March 1, 2024, responses by March 15, 2024. The final pretrial conference will be March 27, 2024 at 2:30 p.m. Jury selection and trial will begin April 8, 2024 at 9:00 a.m., with a predicted length of three weeks. The parties had no other matters to bring to the court's attention. Signed by Magistrate Judge Stephen L. Crocker on 6/7/2023. (rks) (Entered: 06/07/2023) |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DANIEL CHRISTENSEN and PAULA
CHRISTENSEN, as next of kin to DONNA
CHRISTENSEN, and as special administrator to her
estate,

Plaintiffs,

v.

WILLIAM WEISS, SHERIFF JOSEPH FATH, VILAS
COUNTY, KAYLA ANDERSON, OFFICER BRENT
WILMOT, JOHN AND JANE DOE OFFICERS 1-10,
ADVANCED CORRECTIONAL HEALTHCARE,
GREGORY SCOTT, LINDA THAYER, and
ABC INSURANCE COMPANIES 1-10,

Defendants.

OPINION and ORDER

22-cv-253-jdp

---

Plaintiffs Paula and Daniel Christensen are suing various defendants for causing the death of their daughter, Donna Christensen, while she was housed at the Vilas County jail. On the day their summary judgment submissions were due, plaintiffs filed a motion under Rule 56(d) to extend their time to respond to the motion for summary judgment filed by defendant Advanced Correctional Healthcare (ACH) and its employees. Dkt. 49. Plaintiffs did file a response to that motion, but they say that they need more time to supplement their response to include the following evidence: (1) deposition testimony of defendants Gregory Scott and Linda Thayer, who were recently deposed, but transcripts were not available at the time plaintiffs' response was due; (2) deposition of testimony of Melissa Caldwell, who has not yet been deposed; and (3) an expert report that takes account of Caldwell's testimony.

Plaintiffs don't say how much time they need, but they do say that Caldwell can't be deposed until August "due to other scheduling conflicts." Dkt. 50, at 3. So granting plaintiffs'

RA. 5

motion would require striking the schedule, something the court already did once in this case. *See* Dkt. 32.

Federal Rule of Civil Procedure 56(d) allows a court to deny or defer consideration of a summary judgment motion if the nonmoving party shows that "it cannot present facts essential to justify its opposition." To obtain relief under Rule 56(d), the nonmoving parties must: (1) identify "specific evidence" they seek to support their claims; (2) explain how that evidence would defeat the pending summary judgment motion; and (3) show that they acted reasonably in failing to obtain the discovery sooner. *See Citizens for Appropriate Rural Roads v. Foxx,* 815 F.3d 1068, 1082 (7th Cir. 2016); *Davis v. G.N. Mortgage Corp.,* 396 F.3d 869, 885 (7th Cir. 2005); *United States v. All Assets & Equipment of West Side Building Corp.,* 58 F.3d 1181, 1190–91 (7th Cir. 1995).

Plaintiffs say nothing about how the deposition testimony of Scott or Thayer would help them defeat defendants' summary judgment motion, so the court will deny plaintiffs' Rule 56(d) as it relates to the depositions of those two witnesses. As for Melissa Caldwell, plaintiffs say that she was responsible for supervising defendant Kayla Ziemba, a social worker, who plaintiffs say was not qualified to provide care to Donna Christensen. This suggests that plaintiffs believe that Caldwell may be partially responsible for causing harm to Donna, but Caldwell isn't a defendant. Plaintiffs don't explain how deposing Caldwell will help them defeat the summary judgment motions of any of the existing defendants. Plaintiffs say generally that Caldwell could explain "who was responsible for setting [ACH's] corporate policies relating to meeting Wisconsin's requirements in terms of a qualified mental health professional." Dkt. 50, at 4. But they don't explain why they couldn't have obtained that information directly from ACH months ago, so plaintiffs haven't shown that they acted with reasonable diligence.

2

Even if Caldwell could provide unique information, the court isn't persuaded that plaintiffs acted with reasonable diligence in waiting so long to depose her. Plaintiffs have known about the summary judgment deadlines since August 12, 2022. Dkt. 15. But plaintiffs say that they didn't find out about Caldwell until they deposed the jail administrator in April 2023. They also say that they scheduled Caldwell's deposition for June 9, but "counsel for plaintiffs had a conflict arise that made it impossible to take place." Dkt. 50, at 3.

This argument isn't persuasive for multiple reasons. First, plaintiffs don't identify the nature of conflict that their counsel had for the June 9 deposition, so the court cannot determine whether the decision to reschedule was justified. Plaintiffs knew at the time what their summary judgment deadline was, so they would need to demonstrate that an extraordinary circumstance outside their control prevented them from taking that deposition. Second, plaintiffs don't explain why they waited until June to try to depose Caldwell when they knew in April that they wanted to depose her, and they knew that summary judgment deadlines were approaching fast. Third, plaintiffs don't explain why they waited until the eve of summary judgment to schedule the jail administrator's deposition. The parties are free to defer depositions until the last minute if they choose, but their own delay can't be a justification for seeking lengthy extensions when those last-minute depositions uncover potentially helpful new information that requires follow up.

The bottom line is that plaintiffs haven't shown how the evidence they seek is necessary to defeat a pending motion for summary judgment, and they haven't shown that they acted with reasonable diligence. The court will deny their Rule 56(d) motion.

ORDER

IT IS ORDERED that plaintiffs' motion for an extension of time under Federal Rule of

Civil Procedure 56(d), Dkt. 49, is DENIED.

Entered June 12, 2023.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

RA. 8

| Date Filed | # | Docket Text |
|---|---|---|
| 06/15/2023 | 65 | **\*\* TEXT ONLY ORDER \*\*** Plaintiffs move for leave to file an untimely declaration in support of their opposition to defendants' motion for summary judgment. Dkt. 62 . I'd often accept a filing that was only a few days late. But this one doesn't stand on its own: the declaration would be useful only if it were cited in the plaintiffs' proposed facts and, probably, explained in their opposition brief. If plaintiffs simply submitted the declaration now, defendants wouldn't know how to respond to it and the court wouldn't know what to make of it. Plaintiffs would have to re-submit their entire summary judgment opposition to make use of the declaration. Plaintiffs' motion is DENIED. On a related note: The court encourages plaintiffs' counsel to carefully read the Pretrial Conference Order and the packet of attachments that explain how cases are to be litigated in this court (and note the guidance on filing deposition transcripts). Signed by District Judge James D. Peterson on 6/15/2023. (rks) (Entered: 06/15/2023) |

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

DANIEL AND PAULA CHRISTENSEN,
*et al.*,

      Plaintiffs,

v.                                               Case No. 22-CV-253-jdp

WILLIAM WEISS, *et al.*,

      Defendants.

## DECLARATION OF AMBER CARDA, PSY.D

     I, Dr. Amber Carda, being first duly sworn on oath, deposes and states as follows:

    1.    I was retained as an independent expert consultant by plaintiffs in this case, and I provide the information contained within this declaration based upon my expert review of the case materials and can competently testify to the facts stated herein, if sworn as a witness.

    2.    A copy of my curriculum vitae expert report submitted in this matter is attached hereto as Exhibit 1, which summarizes my education, qualifications and training that support the expert opinions expressed herein.

    3.    My recent travel, the week of June 5th through June 12, 2023 compromised my ability to submit this declaration in a timely manner to meet the June 9, 2023 filing deadline. I was unable to communicate with counsel for plaintiffs and had inadvertently failed to turn on an out of office response.

    4.    I reserve the right to supplement my opinions set forth herein in a formal report pursuant to Federal Rule 26, following the consideration of the depositions of Linda Thayer, Gregory Scott, and Dr. Melissa Caldwell, and as necessary, a corporate representative of Vilas

Exhibit 1

County and Advanced Correctional Healthcare ("ACH").  I understand this discovery has either

been scheduled or is in the process of being scheduled and will be taking place shortly.

     5.     I have received the following materials for review and analysis in forming my

opinions in this matter:

        a.   Jail videos of Christensen's stay[1];

        b.   Probation and parole file;

        c.   Body cam footage;

        d.   Transcript of serving discipline papers;

        e.   Jail Custody Manual;

        f.   Complaints and Answers;

        g.   Defendants Responses to Written Discovery and supplements;

        h.   Jail documentation; and

        i.   Depositions of J. Fath, W. Weiss, B. Wilmot, K. Ziemba, S. Malone and C. Christensen.

     6.     The job description for a Qualified Mental Health Professional at the Vilas County

Jail required a current licensure with clinical specialty in the state from the appropriate state

licensing board.  (See DEF 401).

     7.     A clinician is a healthcare professional qualified in the clinical practice of medicine,

psychology, or psychiatry, based on the direct observation of patients, understanding a clinical

history, examinations and investigations and methods of treatment to diagnose a disease or mental

illness.

---

[1] I am still awaiting the opportunity to view video surveillance that was recently produced by Vilas County, and will be incorporating any supplemental opinions into my Rule 26 Expert Disclosure report.

RA. 11

8.      It is undisputed that The National Commission on Correctional Healthcare defines Qualified Mental Health Professionals as "psychiatrists, psychologists, psychiatric social workers, licensed professional counselors, psychiatric nurses, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients."

9.      A qualified clinician uses relevant guidelines to optimize patient care that are informed by a systematic review of evidence and assessment of the benefits and harms of alternative care options.

10.     Without an on-site licensed and qualified clinician as required by Wisconsin law, there was no one capable of evaluating and treating psychiatric emergencies such as Christensen experienced, much less follow through with such patients who should be maintained on long term treatment or psychotropic medications, which enables patients to avoid the unnecessary suffering of acute episodes of mental illness.

11.     Without such medical care, the suffering of repeated acute episodes of mental illness can be predicted as likely, particularly when an inmate is subjected to extreme segregation.

12.     Christensen suffered from an obvious mental illness as shown by her behavior surrounding the altercation with Officer Wilmot, including:

     a.  Communicating a desire to end her life;

     b.  Telling Kayla Anderson (now Ziemba) that she had been hearing voices "for a while" that told Christensen to kill herself; she "couldn't be alone with the voices," ;

     c.  Reported thoughts of self-harm "all the time";

     d.  Reporting to Ziemba that she is 'bipolar' and should be taking medications;

     e.  Has episodes of 'spazzing out' but 'not in front of authority figures' and is seen as an "up and down" person;

3

f.  Reporting she only feels normal on meth; and

g.  Reporting that she wanted a vegan meal tray because people are eating people.

13.     Christensen was seen by Kayla Anderson (now Ziemba) to be screened for suicide risk.

14.     Ziemba did not hold any clinical licensure or otherwise have sufficient qualifications to act as the Qualified Mental Health Provider at Vilas County from December of 2019 through the relevant time of October of 2020.

15.     Ziemba admitted that she was capable of only dispensing "support and encouragement" but could not provide medical (i.e., evidence based) treatment for mental illness and reducing suicide risk.

16.     Rather than refer Christensen to a qualified and licensed medical or mental health professional for a medical diagnosis, Ziemba gave a "provisional" (i.e. possible) diagnosis of "situational distress" and "polysubstance abuse disorder," and noted she is experiencing trauma from her incarceration.

17.     Ziemba testified that a provisional diagnosis is perception of the patients' mental health needs, and a formal diagnosis would require an assessment by a psychologist. She also did not know the difference in scope of licensure for a licensed clinical social worker and a psychologist.

18.     Christensen's obvious signs of mental illness and suicidality should have been addressed by a mental health or medical professional with sufficient experience and training in diagnosing and treating mental illness to so in a meaningful way.

4

RA. 13

19.     The treatment notes from Ziemba clearly demonstrate that Christensen was not seen by a properly qualified clinician to act as a qualified mental health provider at the time of Christensen's stay in October of 2020 for the following reasons:

a.   Failure to conduct an adequate suicide risk evaluation;

b.   Failure to consider or provide any formal DSM medical diagnosis or treatment plan to mitigate suicide risk and provide care for endorsed mental health symptoms;

c.   Lack of discussion of any relevant clinical and historical factors that are suggestive of mental illness;

20.     On October 8, 2020, Ziemba met with Christensen for approximately ten to fifteen minutes and released her based on a canned self-report all her symptoms resolved.

21.     Ziemba's interactions with Christensen amounted to no medical treatment, as indicated for mental illness, and suicidal thoughts and behaviors.

22.     Ziemba further testified that there was no availability to refer Christensen to any properly licensed and qualified clinician to provide medical treatment until after the inmate was released from the jail.

23.     To the extent that Ziemba's interaction is considered medical treatment for her mental illness, it would constitute grossly inadequate care.

24.     The policy of utilizing an unlicensed social worker to act as the Qualified Mental Health Professional without providing any avenue of referral to a psychiatrist constitutes a grossly inadequate policy and departure from the standard of care.

25.     Ziemba released Christensen from suicide watch without making any reasoned assessment or evaluation of the patient's suicide risk.

RA. 14

26.     Based on my experience and training, restricted or segregated environments in correctional facilities are associated with exacerbated mental health symptoms, cognitive decline and increased suicidality, amongst other negative impacts. As such, these environments warrant additional mental health screenings and contacts.

27.     There was a high probability that exposing Christensen to the same conditions of extreme segregation, without any clinical evaluation or medical treatment, would carry an elevated risk to the decline of her mental wellbeing risk, and subsequent decision to end her life.

28.     Documentation and video evidence contained in Christensen's file indicated she experienced and endorsed overt signs of an acute mental health crises, as a result on her confinement. Despite these obvious indicators, she was placed in prolonged confinement, without appropriate mental health and medical care.

29.     Christensen had a known (and documented) history of suicidal ideations and self-harm, as indicated by prior suicide attempts, and command hallucinations telling her to kill herself. There was a substantial risk that a segregated environment and increased isolation would worsen these symptoms for Christensen and significantly increase her suicidal risk.

30.     The prolonged placement of Christensen in extreme segregation without any available medical evaluation or treatment plan is a departure of the standard of care. The absence of such care, grossly ignored her continued psychological suffering, and ultimately disregards indications of her elevated suicide risk leading up to her death by suicide.

31.     No reasonable clinician would place Christensen into extreme segregation after demonstrating the obvious signs of mental illness, a history of self-harm and a recent incident of suicidal thinking without a specialized follow up and treatment plan.

32.     The deliberate actions and inactions in the medical care provided to Christensen is a direct reflection of improperly managing her suicide risk, and ultimately her death by suicide.

33.     All the opinions set forth herein are made to reasonable degree of certainty (more likely than not) and are sworn as being true under a penalty of perjury.

34.     Further affiant sayeth not.

*Amber Carda*

Amber Carda, Psy.D.

RA. 16

| Date Filed | # | Docket Text |
|---|---|---|
| 06/20/2023 | 72 | **\*\* TEXT ONLY ORDER \*\*** Plaintiff moves for reconsideration of the order denying her request to file an untimely declaration, contending that she has satisfied the standard for excusable neglect and that it would be unfair not to consider the declaration. Dkt. 67 . But plaintiff could have avoided this situation in at least three ways. First, she could have prepared her evidence sooner instead of waiting until two days before her summary judgment deadline to ask her witness to review the declaration. Second, when the witness did not respond to counsel's communications, plaintiff could have immediately sought relief from the court, so the briefing schedule could be suspended. Third, plaintiff could have submitted an amended brief and proposed findings of fact that incorporate the declaration, so defendants and the court would know how plaintiff is relying on the declaration. Plaintiff did none of those things. Even now, plaintiff has not submitted amended summary judgment materials. Instead, she asks for another five days to do that. But it is too late. Defendants' reply materials are due today, so allowing plaintiff to submit new materials now would require defendants to redo their work. The motion for reconsideration is denied. Signed by District Judge James D. Peterson on 6/20/2023. (rks) (Entered: 06/20/2023**)** |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DANIEL CHRISTENSEN and PAULA
CHRISTENSEN, as next of kin to DONNA
CHRISTENSEN, and as special administrator to her
estate,

> Plaintiffs,

v.

WILLIAM WEISS, SHERIFF JOSEPH FATH, VILAS
COUNTY, KAYLA ANDERSON, OFFICER BRENT
WILMOT, JOHN AND JANE DOE OFFICERS 1-10,
ADVANCED CORRECTIONAL HEALTHCARE,
GREGORY SCOTT, LINDA THAYER, and
ABC INSURANCE COMPANIES 1-10,

> Defendants.

OPINION and ORDER

22-cv-253-jdp

---

Plaintiffs Paula and Daniel Christensen are suing various defendants for causing the death of their daughter, Donna Christensen, while she was housed at the Vilas County jail. They filed their complaint in May of last year, naming five individual defendants. Dkt. 1. In October, they filed an amended complaint, adding Advanced Correctional Healthcare, Inc., and two more individuals as defendants. Dkt. 20.

Plaintiffs now seek to amend their complaint a second time to add two *more* defendants: (1) Samantha Malone, an officer at the Vilas County jail who witnessed an altercation between the deceased and another jail officer; and (2) Dr. Melissa Caldwell, an employee at Advanced Correctional Healthcare who plaintiffs say placed defendant Kayla Ziemba (formerly Anderson) as the qualified mental health provider responsible for diagnosing and treating mental illness at the jail. Dkt. 80.

Under Federal Rule of Civil Procedure 15(a)(2), the court may grant leave to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). A court may deny leave to amend when there is a good reason to do so, including futility, undue delay, prejudice, or bad faith. *White v. Woods*, 48 F.4th 853, 860 (7th Cir. 2022). Here, the proposed amendment is untimely and would cause unfair prejudice, so the court will deny the motion.

Plaintiffs filed their motion on June 27, 2023. That is more than 10 months after discovery began, *see* Dkt. 15, and nine months after the deadline for filing an amended complaint without leave of court, *see id.*. Most important, it was six weeks after defendants filed motions for summary judgment and one week after those motions were fully briefed. *See* Dkt. 36; Dkt. 44; Dkt. 76; Dkt. 78.

Plaintiffs fail to offer a valid explanation for waiting until now to assert claims against Malone and Caldwell. With respect to Malone, plaintiffs admit they obtained video surveillance and documents during discovery that suggested Malone's involvement, but they say they could not be sure until they deposed her, which took place on April 17, 2023. But plaintiffs don't explain why they waited until April, a month before dispositive motions were due, to depose a potential defendant. And the only reason they offer for waiting from April until now to amend their complaint is that they were too busy tending to other matters. Plaintiffs' excuses fail to show that they acted with reasonable diligence.

As for Caldwell, plaintiffs say they had no reason to suspect her involvement until they deposed Jail Administrator Weiss and Ziemba on April 19 and 25, 2023, respectively. They blame this lack of knowledge on defendants Vilas County, ACH, and Ziemba, who they say failed in their Rule 26(a) disclosures and written interrogatories to disclose Caldwell as someone having knowledge relating to the allegations of the complaint. But plaintiffs' own

2

documents refute this assertion. Ziemba's response to Interrogatory No. 9, dated September 15, 2022, asked her to identify undocumented conversations about Donna Christenson. Ziemba responded that she had spoken with her "clinical supervisor, Dr. Melissa Caldwell, regarding the passing of Donna Christensen." Dkt. 82-8, at 5. Plaintiffs' amended complaint against ACH includes that it "failed to adequately train and *supervise*" its employees. Dkt. 20, at ¶ 114 (emphasis added). So plaintiffs knew a long time ago that Dr. Caldwell, Ziemba's *supervisor*, might be someone with knowledge relevant to their complaint. Further, as with Malone, they don't have a good reason for waiting from April until now to seek to add Caldwell as a defendant.

In sum, plaintiffs should have been more diligent in pursuing discovery once it began, and at the very least should have moved promptly to amend their complaint in April, knowing the dispositive motion deadline was imminent. Their assertion that they couldn't seek leave to amend sooner is unconvincing. The court concludes that plaintiffs engaged in undue delay.

There would also be unfair prejudice if the court were to grant leave to amend. Plaintiffs contend that adding these new defendants would not impact the now-ripe summary judgment motions because the claims they want to assert against the new defendants are related to and involve some of the same evidence as those already pending against other defendants. This argument is frivolous. Regardless of any evidentiary overlap, Malone and Caldwell would be entitled to assert their own defenses, take their own discovery, and file their own motions for summary judgment. And because their defenses could affect those already asserted (and briefed) by the current defendants, fairness would require the court to permit the current defendants to withdraw their fully-briefed motions and file new ones. Essentially, plaintiffs

3

would get a do-over. There is little likelihood that all this could be accomplished without moving the trial date. All of this would impose an undue burden on defendants and the court.

In other cases in which a plaintiff has sought leave to amend the complaint when the case has reached the summary judgment stage, this court and the court of appeals have consistently rejected the request.[1] Plaintiffs cite no contrary examples from this circuit, and they identify no compelling reasons why this case should be the exception to the rule. The court will deny plaintiffs' motion for leave to amend their complaint.

---

[1] *See Bell v. Taylor*, 827 F.3d 699, 705–06 (7th Cir. 2016) (holding that the district court properly denied a motion for leave to amend when the plaintiff did not request permission to amend until nearly eight months after the deadline for amending pleadings and the proposed amendment affected the summary judgment schedule); *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 432 (7th Cir. 2009) (denying leave to amend where plaintiff waited until "three days before the close of fact discovery" to add new claims and a new defendant); *Bowden v. Kirkland & Ellis LLP*, 432 Fed. App'x 596, 600 (7th Cir. 2011) ("the [district] court reasonably concluded that adding new defendants would unduly delay disposition of the case by triggering another round of discovery or flurry of motions"); *Aguirre-Hodge v. Larson*, No. 18-cv-995-jdp, 2022 WL 3908773, at *3 (W.D. Wis. Aug. 30, 2022) (denying motion because amended complaint "would significantly delay disposition of this case"); *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, No. 17-cv-36-jdp, 2020 WL 207222, at *3 (W.D. Wis. Jan. 14, 2020) (deny leave because "[d]efendants have already filed a motion for summary judgment" and allowing amendment "would mean striking the schedule and requiring defendants to revise and resubmit their motion"); *Wisconsin Masons Health Care Fund v. Sid's Sealants, LLC*, No. 17-cv-28-jdp, 2017 WL 5256781, at *1 (W.D. Wis. Nov. 13, 2017) (denying leave when the plaintiff failed to explain why it was unable to obtain necessary information sooner); *S.C. Johnson & Son, Inc. v. Minigrip, LLC*, No. 16-cv-244-jdp, 2017 WL 3503379, at *10 (W.D. Wis. Aug. 15, 2017) (denying leave to amend when motion was filed after the defendant moved for summary judgment, and the plaintiff knew about claim much earlier); *Pope v. Espeseth, Inc.*, 228 F.Supp.3d 884, 886–87 (W.D. Wis. 2017) (denying leave to amend when plaintiff filed motion the same day the defendant's summary judgment motion was fully briefed).

4

ORDER

IT IS ORDERED that plaintiffs' motion for leave to amend their complaint, Dkt. 80, is DENIED.

Entered June 29, 2023.

BY THE COURT:

/s/
_____

JAMES D. PETERSON
District Judge

RA. 22

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DANIEL CHRISTENSEN and PAULA
CHRISTENSEN, as next of kin to DONNA
CHRISTENSEN, and as special administrator to her
estate,

                    Plaintiffs,

          v.                                                    OPINION and ORDER

WILLIAM WEISS, SHERIFF JOSEPH FATH, VILAS                       22-cv-253-jdp
COUNTY, KAYLA ZIEMBA (F/K/A/ KAYLA
ANDERSON), OFFICER BRENT
WILMOT, JOHN AND JANE DOE OFFICERS 1-10,
ADVANCED CORRECTIONAL HEALTHCARE,
GREGORY SCOTT, LINDA THAYER, and
ABC INSURANCE COMPANIES 1-10,

                    Defendants.

---

Twenty-year-old Donna Christensen was booked into the Vilas County jail on a probation hold. Early in her stay, she was placed on suicide watch, but she was released to the general population two days later. Eighteen days after being taken off suicide watch, she hanged herself in her cell in the jail's D-block, where she was the only prisoner at the time. Jail staff tried to revive her, unsuccessfully.

Christensen's parents, acting as next of kin and as administrators of Donna's estate, filed this suit under 42 U.S.C. § 1983 against two groups of defendants who they say were responsible for Donna's death: (1) Vilas County, Vilas County Sheriff Joseph Fath, jail administrator William Weiss, and jail sergeant Brent Wilmot; and (2) the jail's contracted medical service provider, Advanced Correctional Healthcare (ACH), along with three of its employees, social worker Kayla Ziemba (formerly Kayla Anderson), registered nurse Linda Thayer, and physician's assistant Gregory Scott. Dkt. 20. They assert Eighth and Fourteenth

RA. 23

Amendment claims against all the individual defendants, municipal liability claims against the county and ACH, a state law negligence claim against Thayer, and a handful of other state law claims against the county and its employees.

Now before the court are defendants' motions for summary judgment. Dkt. 36 (by ACH, Ziemba, Thayer, and Scott) and Dkt. 44 (by Vilas County, Fath, Weiss, and Wilmot).[1] Defendants argue that they can't be found liable for Christensen's suicide because there's no evidence that any of them was aware of the risk that Christensen would imminently take her own life or that they intentionally disregarded any such risk. *See Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (to prove Eighth Amendment deliberate indifference based on failure to prevent suicide, plaintiffs must prove that defendants subjectively knew the prisoner was at substantial risk of committing suicide and intentionally disregarded the risk). As they point out, Christensen expressed suicidal thoughts and erratic behavior early in her stay, but she appeared to stabilize after two days on suicide watch. From then until her death 18 days later, she consistently denied feeling suicidal, made no requests for counseling or mental health treatment, and exhibited no strange or concerning behavior.

Plaintiffs don't dispute any of this. They concede that they can't prevail in showing that any of the defendants was aware of a substantial risk that Christensen would commit suicide. Instead, they advance more roundabout theories, blaming Christensen's death on her conditions of confinement, excessive force and due process violations by Wilmot, Ziemba's alleged lack of qualifications, or some combination of the above. But as discussed below, there's

---

[1] Plaintiffs filed an untimely cross-motion for partial summary judgment on defendants' claim of qualified immunity. Dkt. 52. The court will deny this motion. The court does not reach the question of qualified immunity because it concludes that no defendant violated Christensen's constitutional rights.

RA. 24

no evidence to support any of these alternate theories of wrongdoing, much less that any defendant's allegedly wrongful actions caused Christensen's death. So defendants are entitled to summary judgment on plaintiffs' federal claims.

As for plaintiffs' state-law claims, the general rule is that the court should not resolve state-law claims in a case like this one in which the court has jurisdiction over the claims solely because they are related to federal claims that are being dismissed. No party identifies a reason to keep the state-law claims, so if plaintiffs want to pursue those, they will have to do so in state court.

## BACKGROUND

The following facts are taken from the parties' proposed findings of fact and the record, including video recordings taken at the jail. They are undisputed unless otherwise noted.

### A. Christensen's admission to the Vilas County jail

On October 1, 2020, Christensen was booked into the Vilas County jail on a probation hold. The jail's booking officer, Austin Calderon, administered an intake questionnaire that asked Christensen about her current medical and mental health. Christensen answered "no" to all the questions, indicating that she had no concerns. She reported that she was not suicidal, had not experienced any major problems recently, had never attempted or contemplated suicide, and that she was not presently contemplating suicide. Recording his own observations of Christensen, Calderon noted no observable mental health problems, no signs of injury, no indications that Christensen was under the influence of drugs or alcohol, and no behavior that would suggest a risk of suicide. However, Christensen's urinalysis results later came back positive for the presence of amphetamines, methamphetamines, and THC.

3

At the time Christensen was admitted, the jail was taking precautions to prevent the spread of the coronavirus. All inmates booked into the jail were placed on COVID-19 quarantine status for 14 days whether they tested positive for the virus or not. During this two-week quarantine period, inmates were required to remain in their cells all day except for one hour alone out in the dayroom.

On October 3, a physician ordered Christensen to take a COVID test. She was moved from a receiving cell to a medical segregation cell to await the results.

## B. October 6–8

### 1. Interaction with Wilmot on October 6

Around 2 p.m. on October 6, while still in the medical segregation cell, Christensen asked for soap from correctional officer Samantha Malone, who was doing rounds. When Malone told Christensen that she would bring her the soap during the next set of rounds, Christensen began kicking the door of her cell and screaming. Malone responded by turning off the TV that was viewable from Christensen's cell door. Christensen then smashed the TV remote on the floor of her cell and covered the window in the door with toilet paper. She proceeded to kick the door of her cell, scream, and cry, before calming down about 30 minutes later. At some point, Sergeant Brent Wilmot told Christensen over the intercom that if she wanted soap, she needed to stop acting like a 12-year-old throwing a temper tantrum.

At 2:32 p.m., Malone entered Christensen's cell to retrieve the remote. Wilmot stood in the open doorway, directly in Christensen's line of sight. Christensen threw a Styrofoam container with food in it in Wilmot's direction. Wilmot then entered the cell to remove Christensen's mattress and blanket as a sanction for her behavior. Wilmot pulled the mattress out from under Christensen while she was still lying partly on it. Christensen then stood up

4

and shoved Wilmot.[2] Dkt. 59 (placeholder entry for videos), Ex. 20, at 2:32:17-:18 (video from Seg Hall 2). Wilmot responded by physically restraining Christensen against the bunk in her cell for approximately 10 seconds as Officer Malone finished removing the contents of the cell.

During the incident, Christensen stated, "Like that's gonna stop me from killing myself" and said that she heard voices telling her to kill herself. As a result, Malone and Wilmot removed her from her cell and took her to a holding cell to be placed on suicide watch.

While being changed into a smock, Christensen told Wilmot and Malone that she was "bipolar" and was "normal" when she used meth. She requested a vegan meal tray, stating that she was vegan now because people on the "outs" were "eating other people." When asked if she was taking anything for her asserted bipolar disorder, she replied, "No, but I should be." During this exchange, Christensen admitted to Wilmot that she had shoved him.[3] Dkt. 59, Submission 2, Ex. 28 at 1:16.58 ("I barely shoved you.").

## 2. Disciplinary sanction

Wilmot gave Christensen a 10-day disciplinary sanction of administrative segregation for shoving him in the med-seg cell. Ten days is the maximum punishment available and is the standard discipline issued to all inmates who place their hands on an officer or throw something at an officer. Like inmates serving their 14-day COVID quarantine period, inmates on administrative segregation must remain in their cells for 23 hours a day, with one hour in the

---

[2] Plaintiffs dispute this. According to plaintiffs, when Wilmot pulled the mattress, he caused Christensen to "fall forward up and into [Wilmot] unintentionally." Dkt. 73, ¶ 31 (Plt.'s Prop. Findings of Fact). As discussed further below, this version of events is plainly contradicted by the video evidence and by Christensen's admission later that day that she had shoved Wilmot.

[3] Plaintiffs have submitted a statement from Christensen to her probation officer in which she denied that she pushed Wilmot, Dkt. 59-23, but that evidence would not be admissible under any exception to the hearsay rule.

dayroom. They cannot have physical contact with other inmates, but can talk to other inmates through their cell doors.

Wilmot presented the notice to Christensen on October 6 while she was in the holding cell on suicide watch; their conversation is recorded on audio and video. Dkt. 59-32, Bullpen (20) Video Recording at :35-:50. Wilmot told Christensen that her 10 days of discipline was starting immediately. Christensen responded that "10 days is a long time to be alone." Wilmot told Christensen that if her COVID test came back negative, he would "put her by people." Referring to the disciplinary sanction, Wilmot asked Christensen if she wanted to "appeal it to the next shift or accept it." Christensen responded that she would accept it, and she signed the notice waiving her right to a due process hearing.

Under the jail's security policy, inmates who receive more than five days of discipline are subject to a review of their security status. Applying this policy, unknown jail staff (who are not defendants) re-classified Christensen from a low-medium security inmate to a maximum-security inmate. Maximum security inmates are confined to their cells 23 hours a day but can have access to their personal belongings, television, and reading materials. They can use the dayroom for one hour a day, where they can use the phone, access the television controls, and take a shower. They are not allowed any physical contact with other inmates, but can talk to other inmates through their cell doors. Maximum-security inmates are transported in handcuffs, waist chains and leg irons. Inmates are subject to security reclassification every 30 days.

### 3. Suicide watch

After placing Christensen on suicide watch on October 6, jail staff contacted Kayla Ziemba, who was the jail's designated Qualified Mental Health Professional. Ziemba was

6

RA. 28

employed by Advanced Correctional Health Services, Inc., which had contracted with Vilas County to provide medical services to inmates at the jail.

At the time, Ziemba was certified by the state of Wisconsin as an advanced practice social worker. *See* Wis. Stat. § 457.08(2). She was in the process of obtaining her license to be a clinical social worker, which required her to have "at least 3,000 hours of clinical social work practice, including at least 1,000 hours of face-to-face client contact that includes the diagnosis and treatment of individuals based on the applicable edition of the Diagnostic and Statistical Manual of Mental Disorders, or its equivalent," under appropriate supervision. Wis. Stat. § 457.08(4)(c). Ziemba was supervised, remotely, by Dr. Melissa Caldwell, Director of Behavioral Health Services for ACH. Dr. Caldwell has a doctorate in clinical and forensic psychology, is a Certified Correctional Health Professional, and is an appropriate supervisor under state law. Wis. Stat. § 457.08(4)(c)3. Under Dr. Caldwell's supervision, Ziemba was permitted to perform the duties of a licensed clinical social worker. Wis. Stat. § 457.04(4).

On October 7, Ziemba met with Christensen to assess her suicide risk. Ziemba was familiar with Christensen, having seen her multiple times earlier that year at the jail while Christensen was serving time from January to May 2020. During a mental health screening during that earlier jail stay, Ziemba had noted that Christensen reported a past history of suicide attempts. Ziemba also knew Christensen from providing social services to Christensen's family when Christensen was a juvenile.

When Ziemba evaluated Christensen on October 7, 2020, Christensen told Ziemba that she had thoughts of self-harm "all the time" and heard voices telling her to kill herself. Based on these statements, Ziemba determined that Christensen should remain on suicide watch.

7

Ziemba met with Christensen again the next day. Christensen was alert and oriented and denied any thoughts of self-harm. Christensen said she had a headache and was shaky, which she attributed to drug withdrawal. Ziemba noted that Christensen had good protective factors in place, including family. Based on her interview and observations of Christensen, Ziemba recommended that Christensen be removed from suicide watch and returned to general population. Jail staff removed Christensen from suicide watch at approximately 12:45 p.m. on October 8.

That same afternoon, Christensen's COVID test came back negative. Christensen was transferred to a cell in the D-block of the jail, where she remained until her death on October 26.

## C. October 8–26

### 1. Ziemba and Thayer's treatment of Christensen

Ziemba followed up with Christensen via TeleHealth on October 12. Ziemba observed that Christensen was alert and oriented. Christensen told Ziemba that Christensen had scared herself by her actions on October 6 and that she believed that she had acted that way because of her prior drug use, from which she was withdrawing. Christensen said she was "bipolar" and had episodes of "spazzing out," but not in front of authority figures. She denied any ongoing thoughts of self-harm. Ziemba gave Christensen "provisional" diagnoses of "situational distress" and "polysubstance abuse," and determined that she was stable in the general population. Ziemba determined that Christensen's mental health needs were not serious. She offered support and encouragement, and discussed "self-worth and recovery issues" with Christensen.

8

On October 16, Christensen was seen by Linda Thayer, a registered nurse contracted by ACH. Thayer met with Christensen to conduct a medical history and health appraisal. Thayer noted that Christensen was alert and calm. Christensen told Thayer that she was not under the care of a practitioner outside of the jail and was not on any medications. She denied any thoughts of self-harm, a history of suicide attempts, thoughts of harming others, a history of violence toward others, a history of being victimized, or a history of sexual assault. She acknowledged that she occasionally used alcohol, THC, and methamphetamine.

On October 20, Ziemba followed up with Christensen in person and noted nothing remarkable. Christensen continued to deny thoughts of self-harm or suicide. She did not request any mental health care. Ziemba did not see Christensen after that, nor was she told by anyone that Christensen had reported any further self-harm or suicidal ideations or asked to see someone about her mental health.

On October 22, Christensen submitted a sick call request, asking to be seen for an eczema flare-up on her arms. Christensen was seen by Thayer, who ordered a prescription ointment to treat the eczema. Christensen did not raise any other complaints when she met with Thayer that day.

## 2. Christensen's conditions of confinement and death

The D-block housed only female inmates, who were fewer in number than the male inmates in the jail. *See* Malone Dep., Dkt. 71, at 55:19–25. From October 8–16, there was at least one other inmate besides Christensen on the D-block. However, from October 16 until her death 10 days later, Christensen was the only inmate on the block because of inmate releases or housing reassignments. This was not because she was on solitary confinement or other disciplinary segregation; rather, it was because the mix of inmates resulted in no other

9

inmates being assigned to the block during those 10 days. It is unclear from the record where Christensen would have been housed or what her conditions of confinement would have been had she not been classified as a maximum-security inmate.

Christensen's 10-day disciplinary sanction ended on October 16. For all but the last two days of that period, Christensen was also under precautionary COVID quarantine. On October 16, when her discipline ended, her inmate privileges were restored, including the ability to use the phone, to have personal belongings in her cell, and to have access to television and reading materials. After her privileges were restored, she spoke several times by phone and by video with a friend named Sandy. She also spoke on the phone with her father, mother, and other family members. No one contacted the jail to report a concern for Christensen's well-being at any time before her suicide.

On October 26, jail staff performed documented cell checks of Christensen every hour. No one reported any concerning statements or behavior by Christensen that day or evening. At around 8 p.m., Christensen had a 20-minute video visit with her friend Sandy. On the video available from the D-block, Christensen can be heard crying for about 10 minutes after the visit. At 8:48 p.m., two jail guards entered the cell block and one entered Christensen's cell to remove a bag of trash; neither officer reported seeing or hearing anything unusual. Another guard did a cell check at 9:30 p.m.; she, too, reported nothing unusual. Christensen was discovered hanging by a bedsheet tied to her bunk during the next cell check at around 10:30 p.m. Efforts to revive her were unsuccessful.

10

RA. 32

ANALYSIS

Plaintiffs assert constitutional and state-law claims against two groups of defendants: (1) Vilas County and its employees, Wilmot, Weiss, and Vilas County Sheriff Hath; and (2) ACH and its employees, Thayer, Ziemba, and Gregory Scott, a physician's assistant. On a motion for summary judgment, the question is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or, stated another way, whether a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co.*, LLC, 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Plaintiffs are entitled to the benefit of inferences supported by admissible evidence, but not those "supported by only speculation or conjecture." *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (citation and quotation marks omitted).

Plaintiffs have dropped their claims against defendant Scott, and they haven't attempted to meet any of the tests for municipal liability with respect to the county, so those claims will be dismissed without further discussion.[4] *See John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 614 (7th Cir. 2021)("A party who does not sufficiently develop an issue or argument forfeits it."). As for the remaining defendants, the court will begin with plaintiffs' constitutional claims against the county employees, then address their constitutional claims against ACH and its employees, and finally the state-law claims.

---

[4] The court will also dismiss John and Jane Doe Officers 1-10, whom plaintiffs have never identified. Even though discovery in this case is not closed, the court will not allow plaintiffs to amend their complaint to identify these defendants at this late stage of the case.

11

## A. Constitutional claims against the Vilas County defendants

At first blush, plaintiffs' complaint appears to assert an Eighth Amendment claim against the Vilas County defendants based on their failure to prevent Christensen's suicide. Dkt. 20. To prove such a claim, plaintiffs must provide evidence from which a reasonable jury could conclude that: (1) Christensen had an objectively serious medical condition; (2) the defendant in question knew of the condition and deliberately failed to treat Christensen; and (3) this failure injured Christensen. *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022). A serious medical condition is one that "has been diagnosed by a physician . . . or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quoting *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008)). There is no dispute that suicidality is an objectively serious medical condition.

As plaintiffs concede, there is no evidence that any of the Vilas County defendants was aware that Christensen was suicidal at any time after she was released from suicide watch on October 8, or even that they had any interactions with her from that point on. But as noted at the outset of this opinion, plaintiffs expressly disavow that they are contending that any of the defendants consciously disregarded the specific risk that Christensen would commit suicide. Instead, plaintiffs say they are seeking to hold "prison officials accountable for pain and suffering that [Christensen] wrongly [was] subjected to during periods of isolation in solitary confinement while she was alive, as a consequence of Officer Wilmot unjustly placing her in extreme segregation in the first place[.]" Dkt. 58, at 12. More specifically, plaintiffs contend that Wilmot: (1) used excessive force on her during the confrontation in the med-seg cell on October 6, in violation of the Eighth Amendment; and (2) violated Christensen's right to due

process when he disciplined her, either by fabricating the charge or by coercing her into waiving her right to a due process hearing. *Id.*, at 20–24. Further, the argument goes, Wilmot is responsible for Christensen's death, because her suicide was a foreseeable consequence of these constitutional violations. *Id.*, at 12. (Weiss and Hath are also liable, argue plaintiffs, because they failed to review Wilmot's use of force or his disciplinary sanction. *Id.*, at 13–15.)

Plaintiffs' theory requires some unraveling. According to plaintiffs, when Wilmot entered the med-seg cell on October 6 and pulled the mattress out from under Christensen, he wasn't engaged in a good faith effort to restore discipline but rather was trying to cause Christensen to be "thrown into physical contact with him." *See Wilborn v. Ealey*, 881 F.3d 998, 1006 (7th Cir. 2018) (correctional officers violate the Eighth Amendment when they use force not in a good faith effort to maintain and restore discipline, but maliciously and sadistically for the very purpose of causing harm). Plaintiffs say Wilmot did this so that he could falsely discipline her for putting her "hands on" an officer, which he knew would cause Christensen to be reclassified as a maximum-security inmate. As a result, their theory goes, Christensen was reclassified as a maximum-security inmate and housed in the jail's D-block, where the conditions of confinement were so "extreme" and "prolonged" that—when combined with ACH's failure to treat Christensen's "obvious mental illness"—they caused Christensen to take her own life.

Plaintiffs' theory of liability fails for multiple reasons. The court will focus on three of them: (1) the evidence shows that Wilmot did not use excessive force; (2) Christensen was deprived of no legally protected liberty interest, so there was no due process violation; and (3) plaintiffs haven't shown that Christensen's conditions of confinement were unduly harsh, much less that they caused her to commit suicide.

RA. 35

### 1. Wilmot did not engage in excessive force

Plaintiffs' foundational premise—that Wilmot pulled the mattress out from Christensen in order to "thrust Christensen into physical contact with him against her will," Dkt. 58, at 2— is flatly contradicted by the video evidence. The video from the camera in Seg Hall 2 plainly shows Christensen pushing Wilmot, as depicted below:



Dkt. 59 (placeholder entry), Submission 2, Ex. 20, at 2:32:17-:18. The video does not show that Christensen "fell" into Wilmot as he pulled the mattress out from under her, as plaintiffs argue. And Christensen admitted a few hours later that she shoved Wilmot. Wilmot wasn't the aggressor, Christensen was. No reasonable jury could conclude from the video evidence that Wilmot engaged in excessive force. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (where party's version of events is shown by videotape to be "visible fiction," court may disregard it).

14

### 2. Christensen was not deprived of due process

Under the Fourteenth Amendment, state officials cannot "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. But as plaintiffs acknowledge, due process is required only when punishment implicates a protected liberty interest by extending the duration of confinement or imposing "an atypical and significant hardship on him in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). It is unclear from plaintiffs' submissions whether plaintiffs are challenging Christensen's 10-day term of disciplinary segregation or the change in her security classification (it appears to be the latter), but neither one involves a protected liberty interest. *See Lucien v. DeTella*, 141 F.3d 773, 774 (7th Cir. 1998) ("classifications of inmates implicate neither liberty nor property interests"); *Hoskins v. Lenear*, 395 F.3d 372, 374 (7th Cir. 2005) (loss in privileges and two months in segregation did not trigger due process concerns); *Lekas v. Briley*, 405 F.3d 602, 610–14 (7th Cir. 2005) (even ninety-day placement in disciplinary segregation where inmate was "prohibited from participating in general population activities," deprived of contact with other inmates, and barred from "educational and work programs" did not trigger due process concerns). This is true even if plaintiffs could somehow show that the disciplinary report was fabricated. *Hoskins*, 395 F.3d at 375.

### 3. Plaintiffs haven't shown that Christensen's conditions were severe

Finally, plaintiffs' central contention, namely, that Christensen was subject to "prolonged," "inhumane," "solitary," or "extreme" confinement, is supported with nothing but their own *ipse dixit*. Plaintiffs haven't developed evidence showing what Christensen's conditions were like, how they differed from those enjoyed by minimum or medium security inmates, what placement alternatives were available, or why a different placement alternative

RA. 37

would have reduced the likelihood that Christensen would kill herself. All plaintiffs have shown is that Christensen was the only inmate in the D-block from October 16–26 and that she was allowed an hour out of her cell each day. They haven't developed evidence showing what opportunities she had for social interaction during that time or what those opportunities would have been had she had a different security classification. Plaintiffs aren't entitled to an inference that Christensen's death was caused by her security classification or housing conditions without explaining what those conditions were or presenting evidence to suggest that her death wouldn't have occurred had she been housed somewhere else in the jail. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 666–67 (7th Cir. 2012) ("It is not too much to expect the Estate's lawyers, when complaining about the debilitating effects of the jail's housing decisions, to identify feasible alternatives and to tender evidence supporting the contention that [Christensen] likely would have fared better in one of those alternative placements.").

Plaintiffs seem to presume that the absence of other inmates on the block was enough to provoke Christensen's suicide. Prolonged isolation is unhealthy, but plaintiffs adduce no evidence that it caused Christensen's suicide. It's undisputed that Christensen didn't complain to anyone about the conditions on the D-block, ask to speak with a crisis counselor or other staff about mental concerns, or exhibit any strange behavior or signs of mental decompensation. Christensen may well have been acutely lonely, but she kept it to herself.

Plaintiffs also adduce no evidence that defendants were aware that Christensen was at risk of suicide. Plaintiffs point to Christensen's agitated behavior, crying, and suicide threats while housed in the med-seg cell 20 days earlier. According to plaintiffs, this shows that Wilmot knew that Christensen was prone to "mental breakdown" under "extreme confinement." Once again, plaintiffs offer nothing but bare conclusions in support of this assertion. They don't

16

attempt to demonstrate that the conditions of Christensen's confinement as a maximum-security inmate on the D-block were as "extreme" as they were in medical segregation. And they don't adduce any reliable medical evidence, expert or otherwise, to support their lay contention that Christensen's behavior on October 6 was caused by her confinement (as opposed to drug withdrawal, for example). Finally, there is no evidence that Christensen exhibited any of the same behaviors once she was moved out of the med-seg cell and into the D-block.

In sum, plaintiffs have failed to produce evidence sufficient to show that Wilmot consciously disregarded a substantial risk that Christensen would commit suicide, that he violated her constitutional rights in other ways, or that Wilmot's decisions had anything to do with Christensen's decision to take her own life nearly three weeks later. And absent a constitutional violation, there is no basis for supervisory liability to attach against Hath and Weiss. *Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019) (supervisor not liable under § 1983 absent evidence of a constitutional deprivation). So the court will dismiss the § 1983 claims against the Vilas County defendants.

## B. Constitutional claims against ACH defendants

Plaintiffs assert Eighth Amendment claims against Thayer, Ziemba, and ACH.[5] As with their claims against the county defendants, plaintiffs don't argue that ACH or its employees were aware that Christensen was at substantial risk of committing suicide. Instead, they argue that the ACH defendants consciously disregarded Christensen's "obvious signs of mental

---

[5] Although it is still unsettled whether claims brought by inmates on a probation hold are governed by the Eighth Amendment or the Fourteenth, *see Estate of Clark v. Walker*, 865 F.3d 544, 546 n.1 (7th Cir. 2017), plaintiffs have taken the position that the Eighth Amendment applies, so the court will do the same.

RA. 39

illness." *See Palakovic v. Wetzel*, 854 F.3d 209, 224 (3d Cir. 2017) (parents of inmate who died by suicide could proceed on claim that prison officials violated son's constitutional rights by providing inadequate mental health treatment, regardless whether son had particular vulnerability to suicide). The court addresses the claim against each of these defendants in turn.

### 1. Thayer

Thayer was the nurse who conducted a medical assessment of Christensen on October 16 and then saw her a few days later for her eczema. It is undisputed that Thayer saw Christensen only twice during her October jail stay and that Christensen did not say or do anything during those interactions that would have suggested that she was contemplating suicide, that she had any mental health concerns, or that she had an acute mental illness. Plaintiffs haven't explicitly abandoned their claim against Thayer, but they concede that they don't have sufficient evidence to defeat summary judgment in her favor.[6] Dkt. 57, at 2. So plaintiffs' Eighth Amendment claim against Thayer will be dismissed.

### 2. Ziemba

Plaintiffs fare no better with their claim against Ziemba. Even accepting that Christensen had a serious medical need for mental health care, plaintiffs haven't provided evidence that would allow a jury to conclude that Ziemba consciously disregarded it. It is undisputed that Ziemba *did* provide Christensen with treatment, assessing her four times in

---

[6] Plaintiffs filed a motion under Fed. R. Civ. P. 56(d), asking the court for more time to oppose Thayer's motion for summary judgment. Dkt. 49; Dkt. 57, at 2. This court denied that motion. Dkt. 61; Dkt. 65; Dkt. 72. Nothing in the parties' summary judgment submissions suggests that that ruling was in error or that plaintiffs could establish a viable claim against Thayer even if they had been allowed more time.

18

two weeks, provisionally diagnosing her with situational distress and polysubstance abuse, and offering support and encouragement. Plaintiffs have provided no evidence suggesting that Ziemba's assessment was wrong, much less that her response was "so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998).

This case bears no similarity to *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990), a case cited by plaintiffs. In *Greason*, the prison's psychiatrist abruptly discontinued the inmate's anti-depressant medication without conducting a mental status examination or reviewing the inmate's file; had he read the file, he would have learned that Greason "was a schizophrenic with an extensive history of mental illness and numerous hospital admissions for psychiatric treatment" and that other mental health professionals had indicated that Greason would pose a substantial suicide risk if he was without anti-depressants. *Id.* at 835. Here, by contrast, there are no records indicating that Christensen had ever been diagnosed with a mental impairment, hospitalized for psychiatric treatment, or prescribed any psychotropic or other medications for a mental condition.

Still, plaintiffs insist that Ziemba's care was constitutionally inadequate in two ways. First, they argue that as an advanced practice social worker, she was unqualified to provide "medical" treatment for mental illness; in their view, the only proper response was to refer Christensen to a psychiatrist. Dkt. 57, at 10–14. This argument is unpersuasive. It is undisputed that Ziemba was qualified under state law to provide clinical social work, defined as services "for the diagnosis, treatment, and prevention of mental and emotional disorders," under the supervision of a psychologist like Dr. Caldwell. Plaintiffs cite no case establishing an

19

Eighth Amendment requirement that inmates be treated only by persons holding medical degrees or that a psychiatric referral is required any time an inmate admits to suicidal thoughts, much less evidence showing that Ziemba was aware of this requirement and ignored it.

Second, plaintiffs assert that Ziemba failed to evaluate Christensen "upon placement in prolonged, extreme segregation." Dkt. 57, at 5. This assertion has no facts to support it. As already discussed, plaintiffs haven't shown that Christensen's conditions of confinement were either prolonged or extreme, much less that they had any effect on her mental health. Her conditions were nowhere near as severe as those in *Palakovic*, 854 F.3d at 217, where the inmate had been subject to "multiple 30–day stints in solitary confinement" in a tiny cement cell of less than 100 square feet with only small slit windows, during which time he "was not permitted to make phone calls, his possessions were limited to one small box, and his social interaction and environmental stimulation were severely reduced." What's more, assuming that plaintiffs are referring to the time period when Christensen was the only inmate in the D-block, Ziemba saw Christensen during that time, visiting her on October 20.

Plaintiffs have failed to come forth with any evidence supporting an inference that Ziemba consciously disregarded Christensen's mental health needs, so Ziemba is entitled to summary judgment. But their claim also would fail for lack of causation. *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012)(causation is necessary element of any constitutional tort). Causation has two components: cause-in-fact and proximate cause. *Id.* Cause-in-fact means that "the injury would not have occurred absent the conduct," and proximate cause means that "the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Id.* Here, plaintiffs have provided no evidence from which

20

a factfinder could infer that, had Ziemba actually been a licensed psychologist or psychiatrist or referred Christensen to one, Christensen would not have committed suicide.

For the sake of completeness, the court notes that the outcome would not be any different had plaintiffs been allowed to submit the declaration from their purported expert, Amber Carda, Psy. D., which this court disallowed as untimely. *See* Dkt. 62-Dkt. 66; Dkt. 72 (denying reconsideration). Like plaintiffs, Carda doesn't identify anything specific that Ziemba did wrong; she merely offers the conclusory opinion that Ziemba's care was "grossly inadequate" because she wasn't a "properly licensed and qualified clinician" and because she placed Christensen into "extreme segregation" without evaluating her.[7] Dkt. 64–1. But Carda's opinion is based on the same false and conclusory premises as plaintiffs,' namely, that advanced practice social workers can't offer treatment for mental health disorders, that Christensen was subject to "extreme segregation," and that Ziemba didn't evaluate Christensen after she was moved to the D-block. Absent evidence to support these foundational assertions, Carda's declaration is unreliable and of little value.

In sum, plaintiffs have failed to provide evidence showing that Ziemba acted with a sufficiently culpable state of mind—*i.e.*, that she ignored a known and substantial risk of serious harm—in failing to have Christensen evaluated by a psychologist or psychiatrist, or that taking such action would have prevented Christensen's suicide. Accordingly, the § 1983 claim against

---

[7] Carda does state that Ziemba failed to conduct an "adequate" suicide risk evaluation, but she doesn't say *why* it was inadequate. It is well established that experts must provide more than just a bare conclusion. *See, e.g., Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Zamecnik v. Indian Prairie School Dist. No. 204*, 636 F.3d 874, 881 (7th Cir. 2011) ("Mere conclusions, without a hint of an inferential process, are useless to the court.").

RA. 43

Ziemba will be dismissed.

## C. ACH

Plaintiffs also seek to hold ACH responsible for Christensen's death under the framework established in *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). *See Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 378–79 (7th Cir. 2017) (private corporations providing essential government services can be subject to corporate liability under *Monell* framework). To defeat summary judgment, plaintiffs must present evidence that ACH's "official policy, or an established custom, or a decision by a final decision maker, caused the alleged constitutional violation." *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 568 (7th Cir. 2021). "[I]f institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible," even if there is no individual liability by the institution's employees. *Id.*

Plaintiffs argue that ACH is liable for Christensen's death because Ziemba was not qualified to "evaluate, diagnose[] and treat mental illness at Vilas County jail." This theory is misguided, for two reasons.

First, plaintiffs' argument rests largely on their contention that Ziemba was not a Qualified Mental Health Professional ("QMHP"), as that term is defined by the National Commission on Correctional Healthcare, because the definition doesn't specifically include advanced practice social workers. But as ACH notes, plaintiffs' argument ignores the proviso that a QMPH can be a person "who by virtue of their education, credentials and experience are permitted by law to evaluate and care for the mental health needs of patients." As already discussed, Ziemba undoubtedly was qualified under Wisconsin law to provide this care. *See*

RA. 44

Wis. Stat. §§ 457.04(4), 457.08(4)(c)(3) (providing that an advanced practice social worker can practice clinical social work under appropriate supervision).

Second, whether Ziemba had the proper licensure is largely beside the point. Plaintiffs haven't provided any evidence that ACH was on notice of any inadequate inmate care by Ziemba. As the court of appeals has noted, "without evidence that [the employer] was on notice of inadequate inmate care by [the employee hired to conduct mental health assessments], we do not see how the full scope of [the employee's] qualifications is relevant to establishing [the employer's] deliberate indifference." *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010). The mental health professional in *Minix* had fewer qualifications than Ziemba: she had obtained course work, training, and other experience in fields such as community health, mental illness, and the treatment of prisoners, but, unlike Ziemba, lacked an advanced degree in psychiatry, psychology, or social work. *Id.* Just as the "full scope" of the employee's qualifications was irrelevant to establishing municipal liability in *Minix*, so it is here. Absent any evidence that ACH had a practice or policy that sanctioned or caused its employees to provide constitutionally inadequate medical care, plaintiffs' claim against ACH must be dismissed.

## D. State-law claims

Plaintiffs assert negligence claims against Thayer and ACH, wrongful death claims against all defendants, and abuse of process, malicious prosecution, and promissory estoppel claims against the Vilas County defendants. They appear to rely solely on 28 U.S.C. § 1367, the supplemental jurisdiction statute, as the basis for subject matter jurisdiction over their state-law claims. *See* Dkt. 20, ¶ 19.

"Absent unusual circumstances, district courts relinquish supplemental jurisdiction over pendent state law claims if all claims within the court's original jurisdiction have been resolved before trial." *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019). The court is dismissing all of plaintiffs' federal claims in this case. The parties have briefed the state-law claims, but no one has identified a reason why it would be appropriate for this court to retain jurisdiction. So the court will dismiss the state-law claims without prejudice to plaintiffs refiling them in state court.

### E.  Conclusion

Christensen's death was tragic, and, perhaps, preventable. It is understandable that plaintiffs want to hold someone accountable. But plaintiffs have failed to adduce evidence that would support culpability under the demanding standards of the Eighth Amendment. The case must proceed, if at all, under state-law standards in state court.

RA. 46

ORDER

IT IS ORDERED that:

1. Plaintiffs' motion for partial summary judgment, Dkt. 52, is DENIED.

2. Defendants' motions for summary judgment, Dkt. 36 and Dkt. 44, are GRANTED on plaintiffs' federal claims. Plaintiffs' state-law claims are DISMISSED without prejudice to plaintiffs' refiling them in state court.

3. The clerk of court is directed to enter judgment for defendants and close this case.

Entered December 7, 2023.

BY THE COURT:

/s/
_____

JAMES D. PETERSON
District Judge

25

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DANIEL CHRISTENSEN and PAULA
CHRISTENSEN, as next of kin to DONNA
CHRISTENSEN, and as special
administrator to her estate,

      Plaintiffs,

v.

WILLIAM WEISS, SHERIFF JOSEPH
FATH, VILAS COUNTY, KAYLA ZIEMBA
(F/K/A/ KAYLA ANDERSON), OFFICER
BRENT WILMOT, JOHN AND JANE DOE
OFFICERS 1-10, ADVANCED
CORRECTIONAL HEALTHCARE,
GREGORY SCOTT, LINDA THAYER, and
ABC INSURANCE COMPANIES 1-10,

      Defendants.

Case No.  22-cv-253-jdp

---

## JUDGMENT IN A CIVIL CASE

---

IT IS ORDERED AND ADJUDGED that judgment is entered in favor of defendants dismissing plaintiffs' federal claims and dismissing plaintiffs' state-law claims without prejudice to plaintiffs refiling them in state court.

| | |
|---|---|
| <u>/s/ Deputy Clerk</u> | <u>December 7, 2023</u> |
| Joel Turner, Clerk of Court | Date |